636 So.2d 1194 (1994)
Everildo Carlos VARGAS
v.
DANIELL BATTERY MANUFACTURING COMPANY, INC. and Maryland Casualty Company.
No. CA 93 1249.
Court of Appeal of Louisiana, First Circuit.
May 20, 1994.
*1195 Daniel R. Atkinson, Jr., Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for defendants-appellants Daniell Battery Mfg. Co., Inc. and Md. Cas. Co.
J. Chandler Loupe, Moore, Walters, Shoenfelt & Thompson, Baton Rouge, for plaintiff-appellee, appellant in answer Everildo Carlos Vargas.
Before CARTER, GONZALES and WHIPPLE, JJ.
WHIPPLE, Judge.
This workers' compensation case is before us on appeal from a judgment in favor of plaintiff, Everildo Carlos Vargas, and against his employer, Daniell Battery Manufacturing Company, Inc. (DBM), and its insurer, Maryland Casualty Company (Maryland). We affirm.

FACTS AND PROCEDURAL HISTORY
DBM is in the business of manufacturing lead acid batteries. Plaintiff, a Cuban immigrant, began working for DBM in 1970, and continued his employment there until 1990, when he alleges he became too ill to continue to perform his duties. On November 2, 1990, plaintiff filed a claim with the Office of Worker's Compensation Administration (LDOLWC 1008 petition) seeking disability benefits and medical expenses for a disability due to exposure to hazardous materials.[1] Trial on the merits was held on January 16, 1992. The following facts were revealed at trial.
Plaintiff worked on the assembly line at DBM for twenty-one years, where he was continuously exposed to lead fumes and lead dust, as a result of his employment. Plaintiff's job duties included inserting lead dust into batteries and welding. Plaintiff explained that while performing these tasks, lead dust often blew into his face, mouth and eyes. Additionally, lead dust was often airborne, and collected on plaintiff's clothing and on the water fountain located in the plant.
DBM took certain precautions to protect its workers from exposure to lead. All workers were required to shower before leaving the plant and to leave all clothing at the plant before leaving each day. Employees were also required to wear gloves and masks while working. Plaintiff testified that because of the conditions on the assembly line, despite wearing a mask, he often perspired heavily, causing his sweat, combined with lead dust, to go into his mouth. Plaintiff stated that he often tasted lead in his mouth.
DBM's premises were also equipped to handle the existence of lead and lead dust in the air and on the premises. According to DBM's president, the company tried to follow normal industry standards, as well as OSHA regulations, to minimize the amount of lead dust present. Additionally, workers were periodically tested to determine lead levels present in their blood. On several occasions, plaintiff had high lead levels upon testing, and was removed from the assembly line and monitored.
*1196 According to plaintiff, over the years he often felt ill due to his exposure to lead. Plaintiff recalled complaining of this illness to the company doctor as far back as 1978. Plaintiff testified that despite feeling ill, he continued to work until finally, in 1990, he progressed to a point where he was totally unable to perform his job duties at DBM. At this time, plaintiff complained of a variety of symptoms, including pain in his arms, elbows and knees, abdominal pain, body cramps, sleep disorders and memory deficits. Shortly before plaintiff stopped working at DBM, he had been treated by an orthopedist for pain in his elbows. When his overall symptoms worsened, plaintiff sought treatment from Dr. J.A. Freeman, who upon being informed of plaintiff's various complaints, immediately admitted plaintiff to River West Medical Center. Plaintiff was hospitalized from September 10, 1990 until September 15, 1990.
Dr. Freeman is board certified in clinical pathology, including the areas of clinical toxicology, anatomic pathology and radionuclear medicine, and testified by deposition. Upon plaintiff's admission to the hospital, Dr. Freeman conducted an extensive physical examination and obtained a patient history. Plaintiff related that he had worked for DBM for twenty-one years, where he was exposed to lead. Plaintiff further stated that in the preceding six months, he had become increasingly forgetful, and had experienced memory deficits, migratory joint aches and abdominal pains. Dr. Freeman ordered a complete blood count test, which included a free erythrocyte protoporphyrin (FEP) test, a useful test in determining the extent of lead poisoning. The test results showed that plaintiff's FEP level was elevated to three times the normal level and plaintiff's serum lead level was also elevated. Accordingly, based on plaintiff's symptoms and the abnormal test results, plaintiff was treated with ethylenediaminetetraacetic acid (EDTA), a compound which coagulates heavy metals in the body, including lead. This course of treatment is referred to as chelation therapy. Following treatment, plaintiff's lead levels dropped significantly. However, Dr. Freeman opined that as of September 20, 1990, plaintiff was not fit for employment and that his returning to assembly line duty would risk further damage or a recurrence of his medical problem. While unable to foresee any physical residual disability, Dr. Freeman noted that plaintiff was suffering from additional problems and suggested a psychiatric evaluation. Plaintiff was referred to Dr. Francisco A. Silva, a psychiatrist.
Dr. Silva, accepted as an expert in the field of psychiatry, evaluated plaintiff and testified by deposition. According to Dr. Silva, plaintiff was evaluated on September 25, 1990 and presented with symptoms of dizziness, nausea, abdominal pain, personality disorders, insomnia, memory deficits, impotence and joint aches. Plaintiff also related that he had previously experienced high lead levels, due to his exposure to lead at DBM. Dr. Silva suspected that plaintiff was suffering from organic brain syndrome, i.e., damage to the brain caused by a toxin, tumor disease or trauma. Accordingly, Dr. Silva referred plaintiff to Dr. William Gouvier for neuropsychological testing. Dr. Gouvier issued a report to Dr. Silva, confirming his suspicion that plaintiff suffered organic brain syndrome.
At the time of trial, plaintiff was still under Dr. Silva's care and was being treated for severe depression, which Dr. Silva opined was secondary to the organic brain syndrome. According to Dr. Silva, plaintiff is totally incapacitated due to severe depression and is unable to work due to his inability to concentrate or function for any period of time.
Dr. Gouvier, an expert in neuropsychology, also testified by deposition. Dr. Gouvier evaluated plaintiff, performed a series of tests, and concluded that plaintiff suffered a moderate to severe cognitive brain impairment, as a result of toxic encephalopathy to the brain, caused by lead exposure. Moreover, Dr. Gouvier concluded, based on the testing, that plaintiff was severely depressed, a condition which he suggested was secondary to lead poisoning. Dr. Gouvier further stated that the tests indicated the presence of a peripheral neuropathy, a condition common in cases of lead poisoning. Dr. Gouvier concluded that plaintiff was not able to return *1197 to work, and that in his estimation, as of the time of trial, plaintiff was still impaired. Moreover, Dr. Gouvier concluded that plaintiff's cognitive brain impairment was due to chronic lead poisoning, and that his neuropsychological test results and subsequent mental deficits were consistent with exposure to lead.
Finally, Dr. Thomas J. Callender, a board certified specialist in internal medicine, testified by deposition. Dr. Callender treated plaintiff from December 9, 1991 to January 6, 1992. In Dr. Callender's opinion, plaintiff suffered toxic encephalopathy, secondary to lead exposure. Moreover, Dr. Callender opined that plaintiff's joint pain was secondary to lead exposure. Dr. Callender opined that, given plaintiff's overall history and symptoms, he suffered a classic case of lead poisoning.
Dr. William J. George, an expert in the field of toxicology, testified on defendants' behalf. Dr. George opined that plaintiff's elevated zinc protoporphyrin levels in the past, while suggestive of lead exposure, were not necessarily indicative of lead poisoning. Dr. George further testified that plaintiff's symptoms were not related to lead exposure and disagreed with the conclusion of Doctors Callender and Gouvier that plaintiff suffered any cognitive brain disorder. Dr. George also related the classic symptoms associated with lead exposure and admitted that plaintiff suffered from those symptoms. Nonetheless, Dr. George also acknowledged that brain damage can occur in an individual with lead levels comparable to those found in plaintiff over the years, and admitted that plaintiff's lead levels between 1978 and 1980 were often very high. Dr. George concluded that plaintiff's health problems were not related to lead exposure.
After hearing the evidence presented at trial, the hearing officer granted judgment in favor of plaintiff, awarding disability benefits for a temporary total disability and medical expenses. However, the hearing officer's judgment states that "claimant did not, however, prove a developing injury, resulting in `lead poison' [sic]."
From this judgment, defendants appeal, asserting the following specification of error:
The Administrative Law Judge's conclusion that the plaintiff was temporarily totally disabled was manifestly erroneous in light of his factual finding that the plaintiff failed to prove that he suffered lead poisoning.
Plaintiff answered the appeal, and set forth the following assignment of error:
The Workers' Compensation hearing officer committed manifest error in stating that the claimant failed to prove "a developing injury, resulting in lead poison (sic)."

LEGAL PRECEPTS
Every employee disabled by an occupational disease shall be entitled to compensation as if he received personal injury by accident arising out of and in the course of his employment. LSA-R.S. 23:1031.1A. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. LSA-R.S. 23:1031.1B.
The plaintiff in a workers' compensation action based on an occupational disease must establish by a preponderance of the evidence that there is a disability which is related to the employment related disease. Laurendine v. Fischbach & Moore, Inc., 398 So.2d 1220, 1221 (La.App. 4th Cir.1981). An occupational disease has been defined as the result of a series of events often imperceptible in nature which are eventually evidenced in the manifestation of a disability. Freeman v. Poulan/Weed Eater, 618 So.2d 618, 623 (La.App. 2nd Cir.1993), reversed on other grounds, 630 So.2d 733 (La.1994). Similarly, the plaintiff must show that he contracted the disease during the course of his employment and that the disease was the result of the nature of the work performed. Laurendine, 398 So.2d at 1221.
Whether plaintiff is disabled as a result of an occupational disease or illness is a question of fact, and it is well settled that an appellate court will not set aside a finding of fact unless it is clearly wrong or manifestly erroneous. Stobart v. State Department of *1198 Transportation and Development, 617 So.2d 880, 882 (La.1993).

DEFENDANTS' ASSIGNMENT OF ERROR
Defendants argue on appeal that the hearing officer's conclusion that plaintiff was temporarily totally disabled was manifestly erroneous in light of his factual finding that plaintiff failed to prove that he suffered lead poisoning. We disagree.
In order for this court to reverse the hearing officer's factual finding, it must be determined that a reasonable factual basis does not exist in the record for the finding of the trial court, and that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Further, even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where there exists a conflict in testimony. Stobart, 617 So.2d at 882. A reviewing court must always keep in mind that, if the finding of fact is reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Stobart, 617 So.2d at 882-883.
After reviewing the record herein, we conclude that the hearing officer in this case adequately addressed the issues presented and properly construed the Worker's Compensation Act liberally in favor of the claimant in this case, as mandated by the act. Moreover, we find no error in the hearing officer's conclusion that while plaintiff failed to prove that he had "lead poisoning," he nonetheless proved that he suffered a disability as a result of lead exposure, due to his contact with lead, lead dust and lead fumes over the years while employed by DBM. As the hearing officer noted in written reasons for judgment:
The company admitted that they strictly adhered to OSHA regulations, but that there were times when the lead level got above the tolerance point. There is evidence that repetitive lifting and the claimant's arthritic condition, plus his long time exposure to the lead has exacerbated the claimant's physical well being to the point that he has become certifiably disabled.
It is undisputed by the parties that plaintiff has been employed by DBM in excess of twenty years, and that DBM is engaged in the business of manufacturing lead batteries. The record clearly establishes that plaintiff worked on the assembly line in DBM's plant and was continuously and constantly exposed to lead. The medical and lay testimony, and the documentary evidence and medical records, adequately support the hearing officer's conclusion that plaintiff is unable to work as a result of his repeated exposure to lead. In reaching this conclusion, we note that none of the experts in this case set forth, with any degree of clarity, any uniformly accepted medical definition of what constitutes "lead poisoning." However, the testimony of defendants' expert in toxicology addresses the distinction apparently made by the hearing officer between lead exposure and lead poisoning. As conceded by Dr. George at trial, while plaintiff's symptoms were not necessarily indicative of lead poisoning, plaintiff's symptoms were consistent with lead exposure.
In deciding whether an employee has proven his claimed disability, the totality of evidence must be considered. Batiste v. Johns-Manville Sales Corporation, 478 So.2d 1276, 1280 (La.App. 5th Cir.1985). Thus, although the hearing officer concluded that plaintiff failed to establish that he had sustained "lead poisoning," we find that the hearing officer properly concluded that plaintiff, due to his exposure to lead over the years, sustained a work-related disability for which he is entitled to compensation and medical benefits. Accordingly, the hearing officer's conclusion that plaintiff was entitled to compensation benefits and medical expenses, even in light of his factual finding *1199 that plaintiff failed to prove that he suffered lead poisoning, is not erroneous.
This assignment of error is without merit.

PLAINTIFF'S ANSWER TO APPEAL
Plaintiff contends that the hearing officer was manifestly erroneous in his factual finding that plaintiff had not suffered from lead poisoning. We find no merit in this argument. As stated above, to reverse the hearing officer's factual finding, this court must determine that a reasonable factual basis does not exist in the record for the trial court's finding, and that the record establishes that the finding is clearly wrong or manifestly erroneous. Stobart, 617 So.2d at 882.
Plaintiff's physician, Dr. Freeman, testified that plaintiff suffered from lead poisoning, and treated plaintiff accordingly. Other physicians, including Doctors Silva and Gouvier, likewise treated plaintiff based on the diagnosis that plaintiff suffered lead poisoning. Dr. Callender also agreed with Dr. Freeman's diagnosis that plaintiff suffered lead poisoning. However, several physicians testified on behalf of the defense in this case, and opined that plaintiff did not suffer lead poisoning and/or disagreed with the course of therapy offered by Dr. Freeman.
In concluding that plaintiff had failed to establish that he suffered lead poisoning, the hearing officer noted that "[s]ome of the medical information was downright conflicting, and the rest is inconclusive...." In this case, the hearing officer was presented with two permissible views concerning whether plaintiff suffered full-fledged lead poisoning as a result of his exposure to lead while employed by DBM. Considering the record in its entirety, we are unable to say that the hearing officer's findings were manifestly erroneous.
Thus, the assignment of error filed by plaintiff in his answer to the appeal is also without merit.

CONCLUSION
For the above and foregoing reasons, the hearing officer's judgment of November 17, 1992, in favor of plaintiff, Everildo Carlos Vargas, and against defendants, Daniell Battery Manufacturing Company and Maryland Casualty Company, is hereby affirmed. Costs of these proceedings are assessed equally against the plaintiff and defendants.
AFFIRMED.
NOTES
[1] An amended claim was filed by plaintiff on May 29, 1991.