liKLIEBERT, Chief Judge.
In this workers’ compensation case, plaintiff Lucille Faridnia sued her employer, Ecolab, Inc., and their insurance carrier for benefits due to her alleged development of an occupational disease due to exposure to pesticides during the course and scope of her employment. Mrs. Faridnia filed the Form 1008 with the Office of Workers’ Compensation on February 8, 1990. At the April 23, 1991 trial, the court ruled against plaintiff, dismissing her case, finding both that her claim had prescribed and that Mrs. Faridnia had failed in her burden of proving an exposure to pesticides and a resulting occupational disease. After reviewing the briefs, record evidence, and exhibits, we affirm the trial court’s ruling in both respects. Furthermore, because the Office of Workers’ Compensation hearing officer provided excellently detailed reasons for judgment, we hereby adopt them in full as our reasons for judgment, with additional comments following the trial court’s reasons:
RULING OF THE COURT
Considering the law, evidence and argument of counsels, it is the ruling of the court that:
1. The defendants’ Exception of Prescription is hereby granted.
The claimant’s suit for occupational disease benefits had prescribed when filed on February 8, 1990.
|2R.S. 23:1031.1(E) states the required three elements which together trigger the commencement of the six-month prescriptive period. The evidence indicates the following with respect those elements:
“(a) The disease manifested itself.” — the claimant testified that the noxious odors were prevalent throughout her employment with APEST/ECOLAB, August, 1984 — April, 1989 and that she began to experience the effects within one week of her employment.
*952 However, she did not directly relate the odor to her symptoms until February 13, 1989, when she first saw Dr. Palmer, Neurologist. She indicated to Dr. Palmer in her history that she had had headaches for about 2 years and felt them to be related to her continuous exposure to toxic chemicals at work through the constant, strong odor which permeated into her office. She indicated that the headaches lessened on the weekends while away from work and during a period of disability due to ulcers, the headaches markedly decreased.
“(b) The employee is disabled from working as a result of the disease.”— Dr. Rubin, ENT, stated that the claimant was temporarily totally disabled from her employment as the result of her occupational disease from May 4, 1989 — December 26, 1990. The claimant was not working during this period. Initially, Dr. Price had disabled her medically due to ulcers, unrelated to her alleged occupational disease, from April 4, 1989 — June 6, 1989. Her job was terminated due to the position having been phased out on April 6, 1989.
“(c) The employee knows or has reasonable grounds to believe that the disease is occupationally related.” — As stated in (a), the claimant stated her “reasonable grounds to believe” to Dr. Palmer in February, 1989.
Therefore, with all elements in conjunction, the prescriptive period began on May 5, 1989 and lapsed on November 5, 1989. The claim had prescribed as of the February 8, 1990 filing date.
2. The claimant failed to sustain her burden of proof by showing that her symptoms were the result of indirect exposure to toxic chemicals at work; therefore, contracting an occupational disease. The case is dismissed at claimant’s costs, including any depositions and expert fees already paid or charged.
The claimant had a history of psychiatric episodes as well as known allergies to many everyday elements in nature. By her own testimony, at age 14 she attempted suicide to attract attention. Louis Cochran, her first ex-husband, testified that she attempted suicide by taking pills shortly before their marriage in the early 1970’s, receiving counseling for several years by Dr. Diamond.
She was hired by APEST as receptionist/bookkeeper in August, 1984. APEST was a pest control firm for residential/commercial purposes. She would dispatch the technicians to their various jobs, keep books, answer the 1.■¡phone, and inventory product within its containers; as the years passed the job evolved into office manager. APEST was sold to Ecolab in December, 1986. The pesticides were kept in closed containers in the warehouse portion of the building and she worked in the office set apart from the warehouse. However, the testimony is convincing that the smell of the pesticides, or solvents used, permeated the entire building. It is also clear from all of the testimony that the claimant never worked as a technician nor was she ever directly exposed to any chemical at work.
After working for APEST for many months, in 1985 she went to Dr. Coleman, Allergist, complaining of nasal congestion, sore throat and headaches. He diagnosed her allergies to dust, trees, grasses, flowers, and mold. He began to give her allergy injections and told her that there was nothing to relate her symptoms to chemicals; chemicals were not her problem.
On June 13, 1987 she was seen by Dr. Bonner, Endocrinologist, for possible hyperglycemia [sic]. In the history given him, she stated that she had been depressed all of her life and informed him of her earlier suicide attempts. His diagnosis at that time was depression or manic depressive disorder and to rule out reactive hypoglycemia.
On January 19, 1988 she saw Dr. llene Correa, Psychologist, for depression and informed her of her previous suicide attempts, that she and her siblings had been abused as children, her failed first marriage and that her two children were in the *953 custody of their father. She stated that her second marriage of four years had no major problems. She complained of depression, cried throughout the session, felt abandoned by her daughter and her friend, received no satisfaction at her job, felt helpless, had decreased activities, sleep disturbances, loneliness and could not concentrate. She was diagnosed with Major Recurrent Depression.
In November 1988, Dr. Maher, Gas-troenterologist, found ulcers and disabled her from work until February 2,1989. Dr. Maher’s examination of January 9, 1989 indicates that all ulcers had healed at that time. The claimant testified that she was taking a lot of aspirin for headaches at the time and this is probably the cause for the ulcers.
On February 2, 1989, the claimant was given her termination notice, effective in 60 days; as her position had been phased out. The employer, Ecolab, offered to discuss assisting in moving her to a position of gainful employment where her talents could be utilized. The notice further stated that the termination was in no way reflective of her job performance and this was followed up with a job reference which highly praised her loyalty and job performance. Her hours were reduced to 2 days per week with full pay!
On February 13, 1989, she saw Dr. Palmer, Neurologist. She had bad headaches for the past 2 years and felt they were the result of the constant smell of chemicals at work, that they would lessen on the weekends and during her disability due to her ulcers, and that she had loss of memory, depression and heightened emotionality. Dr. Palmer ran many tests and all result were normal. He referred her to Dr. Black, Neuropsychologist because of her stated changes in her mental functions. His impression with regard to her headaches was that she either had migraines, vascular headaches aggravated by exposure to unpleasant fumes, or neurotoxins had caused brain damage resulting in cognitive difficulties in addition to the headaches and he needed to rule out more common causes of headaches.
14Pr. Palmer was never able to find any objective evidence for the cause of her headaches. He treated her with prescription drugs and saw her on an “as needed” basis until March, 1990. His final diagnosis was that her headaches were related to her exposure to chemicals at work based solely on her statements regarding same as it was all he had to go on. He also stated that the headaches could be psychogenic in nature as well. He referred her to Dr. Sanders, Psychiatrist, after receiving Dr. Black’s report.
In March, 1988 the claimant saw Dr. LeBrun, Pulmonologist, for shortness of breath and recurrent pain in the upper right quadrant with belching and nausea. His exam, spirometry and EKG were normal. He couldn’t understand why she would have these symptoms. She also saw Dr. Black, whose team spent a lot of time testing her. The results were within the normal range mostly, with many unexplained inconsistencies, but there was a spotty pattern of neuropsychological deficits. He stated that it was possible that these were secondary to prolonged toxic exposure but this was not compatible with his clinical picture. He questioned her reliability because in interview she seemed to have and [sic] quick grasp of her complaints and problems but was very vague about her past medical history. He did think that she may have a hearing loss. He felt that she was definitely a candidate for psychiatric treatment and stated that she showed chronically significant depression with somatic concerns.
It is significant to note that in March she also returned to Dr. Palmer with a list of chemicals to which she felt she could have been exposed. He read up on the list, and after telling her that there were certain symptoms of which she did not complain that would more readily indicate exposure; she immediately complained of exactly those symptoms! These were never mentioned to any doctor before: facial numbness and tremors.
She also saw Drs. Castrogiovanni and Price in March, 1988 for abdominal pain. On April 4, Dr. Price, Gastroenterologist, found the ulcers and disabled her from *954 work until June 4. Dr. Price testified that he did not relate her ulcerations to chemical exposure at work as he has never heard or read of ulcers being caused by toxic chemicals; with the exception of aspirin and anti-inflammatory medication ingested.
On April 6, 1989, she was terminated at work.
On May 4, 1989 she saw Dr. Sanders, Psychiatrist, per Dr. Palmer’s referral. She indicated to him that she had headaches and ulcers, was under a lot of pressure when she had been at work as her boss screamed at her and belittled her, she was depressed, cried a lot, and it was hard for her to find another job. He found her mental status to be depressed, anxious, but well-oriented and found no psychosis. He testified that he attributed her headaches partly to her exposure but also to her history of depression and to job stress. He stated that because of her past depression, she was pre-disposed to have a reaction to any exposure. Once the exposure stopped, he would expect the effects to be minimal, but they could be chronic.
That same day she saw Dr. Rubin, ENT per Dr. Palmer, who began a series of tests, interviews and evaluations. These took three days. He was investigating her complaints of nasal congestion and difficulties with balance. The tests showed her allergies to grasses, weeds, dust, White Oak trees, cats, and several foods. He [sic] blood screen was normal, but her blood test showed an increase in trichloro-ethane. Her MRI was normal, but other tests indicated that her inner ear and connections were abnormal. He stated that there was | sliterature to show a connection between the increased level of trichloroeth-ane and the balance system. She had given him a list of suspected chemicals exposed to at work and at least two of them could have been the culprits. He stated that her headaches were due to inner ear imbalance and allergies. He also is staking most of his impressions on the history she gave him as to the onset of headaches and their frequency. He treated her with allergy injections.
She was treated by Drs. Palmer, Sanders, and Rubin throughout 1989 and 1990.
On June 30, 1990 her boyfriend put her out of the house. Three days later, she tried once again to commit suicide by taking an overdose of Halcion and Nolredan. The empty bottles and a note were found by the paramedics in her bed. She was taken to the East Jefferson General Hospital and seen there by Drs. Maher and Sanders. She was diagnosed with overdose, peptic ulcer disease and some muscle strains. Dr. Sanders diagnosed a possible major depression. The claimant told him that she feared that she now had stomach lesions indicating cancer and that two previous employees of Ecolab contracted cancer.
In August, 1990, Gallbladder Visualization and Abdominal ECHO are normal. In October, 1990, GI Endoscopy and Oral Cholecystogram are normal. On October 17, 1990 she sees Dr. Roniger, Psychiatrist. She appeared in a happy mood, carefree, told him she had no memory problems, nor allergies to chemicals. His diagnosis was that she had no psychological illness, but had an adjustment disorder with depressed mood per her romantic summertime suicide attempt. She told him that she wanted to be in a chemical-free environment. She showed no symptoms of any chemical/toxic exposure.
April 15, 1991 she began a comprehensive evaluation by Dr. Swift’s team. Dr. Swift coordinated a team of doctors for the evaluation/testing. Dr. Swift, Occupational Medicine, spent 2 hours in consultation with the claimant, during which she not only refused to fill out her medical history form because of the ongoing lawsuit, but also lied to him concerning her past psychological problems; stating that she had never attempted suicide prior to July, 1990! Since he had access to many of her medical records, he was aware of her longstanding problems with depression as well as various physical medical complaints. She disclosed to him her present complaints and gave him a background with regard to her employment duties with Eco-lab. He examined her head and neck areas, ears, nose and throat, and found them
*955 to be normal. He then referred her for further evaluation to Drs. Strub, Neurologist; Wakeman, Neuropsychologist; and Wise, Psychiatrist to complete the study. Dr. Strub’s examination results were normal. Dr. Wakeman’s testing procedures were mirrors of Dr. Black’s given approximately 2 years earlier and the results were surprisingly similar, different and revealing. The claimant did state to him that she was depressed on the day of the testing and he stated that this could account for some discrepancies. However, on many of the tests she performed much worse than in 1989! This is revealing because she had not been exposed to the supposedly toxic environment for 2 years. However, she would do well and then poorly on tests that were the same only given in different modes or sequences. This indicated to Dr. Wakeman that she was deliberately trying to manipulate the results. He used Dr. Black’s testing scores and records as a baseline with which to measure the claimant’s progress/decline in the tests. He found no evidence of toxic organic brain syndrome and felt that her decrease in performance indicated a lack of relation 16to any toxic exposure in the past, but rather indicates a more direct relation to depression or malingering.
Dr. Wise, Psychiatrist, performed the final stage of testing and consultation. His diagnosis was that of sonamatie [sic] disorder. She also lied to him about her past suicidal attempts. He was of the opinion that either consciously or subconsciously she was feigning her illness. Her deliberate attempts to manipulate Dr. Wakeman’s test results and her lies about her psychiatric problems indicate to the Court that she is malingering or seeking monetary gain and not the victim of chemical toxic exposure.
The Court also heard testimony of a toxicologist and medical toxicologist who were both of the general opinion that even the dangerously toxic chemicals housed on the premises where she was employed required direct acute exposure to cause any harmful effects and that these effects would be eliminated naturally by the body within a few days of the direct exposure.
There was no convincing evidence to the effect that her smelling an unrecognizable odor, even on a continuous basis, was toxic nor directly related to her numerous physical and psychological complaints. There was a great deal of convincing evidence that her complaints were related to allergies, deep-rooted and longstanding psychological problems and even perhaps all the medications prescribed by the various doctors or over-the-counter drugs.
On appeal, the plaintiff contends that the trial court applied the clear and convincing burden of proof, and not the preponderance of evidence standard. We note that plaintiff is correct that the burden of proof is by preponderance of the evidence. Laurendine v. Fischbach & Moore, Inc., 398 So.2d 1220 (La.App. 4th Cir.1981). We see nothing in the hearing officer’s reasons to suggest that the more stringent standard was applied; of the doctors whose testimony most favored Mrs. Faridnia, all agreed that her symptoms could also be due to a psychiatric origin, and none could establish any fact of chemical exposure.
In McKay v. Assured Inspection Mgt., Inc., 588 So.2d 729 (La.App. 5th Cir.1991), this Court held that a claimant fails in his burden of proving an occupational disease when the record fails to show the required “reasonable possibility of causal connection,” in that case, between radiation exposure and cancer. As in the instant case, the doctors’ testimony in McKay could not state to any kind of certainty that the disease had been caused by the exposure, but only opined that the possibility of a causal link existed. This Court found that such equivocal testimony failed to Lprove by a preponderance of the evidence an occupational disease caused by an on-the-job exposure.
The issue to be resolved by the reviewing court in workers’ compensation cases is not whether the trier of fact was right or wrong, but whether the fact finder’s conclusion was a reasonable one; reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where there exists conflicts in testimony. Vargas v. Daniell Battery Mfg. Co., *956 Inc., 636 So.2d 1194 (La.App. 1st Cir.1994). Implementing the above standard, we believe the trial court’s conclusions and results are eminently correct. Therefore, we affirm the dismissal of plaintiffs case. All costs of this appeal are taxed to plaintiff.

AFFIRMED.