STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

06-691

BRENDA CHASSION

VERSUS

CINGULAR WIRELESS

************

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 4,
PARISH OF LAFAYETTE, NO. 04-01577,
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

************

MICHAEL G. SULLIVAN
JUDGE

************

Court composed of Michael G. Sullivan, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.

AFFIRMED AS AMENDED.

Michael E. Parker
Allen & Gooch
Post Office Drawer 3768
Lafayette, Louisiana 70502-3768
(337) 291-1350
Counsel for Defendant/Appellant:
    Cingular Wireless

Harry K. Burdette
The Glenn Armentor Law Corporation
300 Stewart Street
Lafayette, Louisiana 70501
(337) 233-1471
Counsel for Plaintiff/Appellee:
    Brenda Chassion

SULLIVAN, Judge.

Cingular Wireless (Cingular) appeals a judgment awarding Brenda Chassion temporary total disability benefits, medical expenses, penalties, and attorney fees based upon a finding of disability due to lateral epicondylitis that developed while she was in its employ. Ms. Chassion has answered the appeal, seeking additional attorney fees for defending the appeal. For the following reasons, we affirm as amended.

### Discussion of the Record

Ms. Chassion began working for Cingular as a customer service representative (CSR) in October of 2001. In describing her duties as a CSR, she testified that, while taking incoming calls from Cingular customers, she had to access their accounts from a computer file and type in what the customer wanted or what was said at the time of the call. She did so while sitting at a computer terminal with a telephone headset and entering data while operating a computer keyboard and mouse. She explained that, as a single mother, she accepted overtime whenever it was offered, and she estimated that in July of 2003, she was working approximately sixty hours per week. She also testified that she was offered overtime not to take lunch breaks, which she often accepted, and that she sometimes did not take her fifteen-minute breaks, at Cingular's request, to help out when they were busy.

On August 25, 2003, Ms. Chassion reported to her manager that her hand started hurting while she was typing. She described her pain as moving up the left arm to the neck "like it was something pulling." She stated that her manager told her to start taking a half-hour lunch break, instead of no lunch at all, but this did not seem to help.

Ms. Chassion was first seen by Dr. James Clause, who diagnosed tendinitis. On September 16, 2003, Dr. Clause referred Ms. Chassion to an orthopedic surgeon, Dr. Angela Mayeux, who began treating her on October 1, 2003. Dr. Mayeux noted that Ms. Chassion's chief complaints were neck pain and left arm pain, with occasional right arm pain, and decreased grip strength of the left hand. Ms. Chassion had reported to Dr. Mayeux that "she has been doing a tremendous amount of overtime, up to 60 hours in a week" as a clerical worker who does a lot of typing. Dr. Mayeux's diagnosis was cervical strain and bilateral lateral epicondylitis secondary to overuse. Her plan of treatment included physical therapy, pain medication, and remaining off work. On October 20, 2003, after ten physical therapy visits, Ms. Chassion reported that she was fifty percent better, but Dr. Mayeux still noted that examination of the arms revealed "fairly significant lateral epicondylitis." Dr. Mayeux approved additional physical therapy, with a return to work expected on November 5, 2003.

On November 12, 2003, Ms. Chassion reported that her elbow pain worsened after she returned to work and that she still had left neck complaints. Noting that Ms. Chassion still had "bilateral lateral epicondylitis much worse and [sic] left in the right," Dr. Mayeux injected both arms and extended her physical therapy prescription, while recommending that she remain off work until the following Monday. On December 17, 2003, Dr. Mayeux noted that Ms. Chassion's left lateral epicondylitis had healed, but that it was still present on the right. Dr. Mayeux again injected the right arm and recommended that she be put on work four hours per day for the next month. On January 13, 2004, Ms. Chassion called Dr. Mayeux's office to report that she could tolerate no more than a half hour at work. When she returned on

2

February 10, 2004, Dr. Mayeux again noted the presence of bilateral epicondylitis, this time worse on the right than the left. Because Ms. Chassion indicated that she was not interested in surgery or injections at that time, Dr. Mayeux prescribed a topical prescription for pain control, later approving additional pain medication.

Ms. Chassion testified that she last worked for Cingular in December of 2003 and that she was terminated in February of 2004, at which time her health insurance benefits stopped. She explained that Cingular's workers' compensation carrier had not paid any of her medical bills. She testified that she applied for unemployment, but she was told that no job could be found for her because she could not use her hands.

In response to a letter written by Ms. Chassion's attorney, Dr. Mayeux issued a written opinion on September 20, 2004, stating that Ms. Chassion's epicondylitis was due to causes and conditions characteristic of and peculiar to her trade, occupation, process, or employment as a CSR with Cingular. Dr. Mayeux also issued another report recommending a series of injections over a twelve-month period and, if that were not successful, a surgical release of the affected elbow(s). She reiterated that "[t]he cause of her epicondylitis is overuse and can be related to the type of work that she does as a customer service representative." In her deposition, Dr. Mayeux testified that seventy-five to eighty percent of the epicondylitis cases that she treats are found in clerical workers, including her own employees who have developed epicondylitis after working long hours on the computer. She stated that, more probably than not, Ms. Chassion's case was caused by overuse in a clerical type position.

3

Rather than sending Ms. Chassion to a doctor of its choosing, Cingular hired an ergonomist, Dr. Lonn Hutcheson, to evaluate the likelihood that her epicondylitis was due to causes and conditions characteristic of and peculiar to her employment as a CSR. Dr. Hutcheson did not interview Ms. Chassion, but reviewed her deposition, as well as a portion of her work records and medical records. Dr. Hutcheson also inspected the equipment in the workstations at the Cingular call center where Ms. Chassion worked and analyzed the keystroke/mouse input required to process five random incoming calls that day.

Dr. Hutcheson concluded that Cingular provided above average workstations with high-end adjustable chairs and desktops. After comparing a random sampling of Ms. Chassion's work records with the data provided by a Cingular manager, Dr. Hutcheson also concluded that Ms. Chassion's overall work output was less than other CSRs. He noted that the mouse-driven equipment used by Cingular required more use of the right hand, whereas Ms. Chassion's epicondylitis was more pronounced on the left. He concluded that, based upon ergonomics literature, the conditions and characteristics of a CSR have not been shown to definitively bring about epicondylitis, particularly when considering that only one other case had been reported at that facility.

After taking the matter under advisement to review the medical records and post-trial memoranda, the workers' compensation judge (WCJ) ruled in Ms. Chassion's favor based upon the "uncharacteristic[ly] clear medical reports" and Dr. Mayeux's "clear and unambiguous diagnosis." The WCJ then concluded that penalties and attorney fees were warranted for the employer's purely defensive action

4

of consulting an expert with no medical credentials and who did not consult with Ms. Chassion before trial.

**Indemnity Benefits and Medical Expenses**

In its first assignment of error, Cingular raises two issues: that the WCJ erred in finding that Ms. Chassion proved an "accident" occurred or that she is not entitled to recover for an "occupational disease" because the employer proved that her injury was not characteristic of or peculiar to a particular job. We first note that whether or not an accident occurred does not appear to be an issue in this case. In her disputed claim for compensation, Ms. Chassion alleged: "Employee developed pain and numbness in both hands, arms, wrists and shoulders *from repetitive use of keyboard for typing and data entry*." (Emphasis added.) The issue identified as unresolved in the mediation report was that "claimant seeks compensability of her *diagnosed alleged occupational disease*." (Emphasis added.) Further, Dr. Mayeux's written opinion that Ms. Chassion's injury is work-related is phrased in terms of the occupational disease statute, as is Dr. Hutcheson's report wherein he states that he was hired to consider whether Ms. Chassion's epicondylitis was "due to causes and conditions that were characteristic of and peculiar to her job . . . ." Accordingly, we will confine our discussion to whether or not Ms. Chassion met her burden of proof under the occupational disease statute. *See Doumite v. KVHP-Fox-29*, 04-427 (La.App. 3 Cir. 10/20/04), 884 So.2d 1283.

Louisiana Revised Statutes 23:1031.1(B) (emphasis added) defines an occupational disease as "only that disease or illness which is due to causes and conditions *characteristic of and peculiar to the particular trade, occupation, process, or employment* in which the employee is exposed to such disease." In *Hymes v.*

5

*Monroe Mack Sales*, 28,768, pp. 6-7 (La.App. 2 Cir. 10/30/96), 682 So.2d 871, 876 (emphasis added) (case citation omitted), the court interpreted the above italicized language as follows:

> The expression "characteristic of and peculiar to," as used in § 1031.1 B, does not mean that the disease occurs *only in persons engaged in the particular employment and not otherwise found among the general public*. Malone & Johnson, *Workers' Compensation Law and Practice*, § 220. Rather, it means that the disease must result from conditions and causes *present in the employment* and *not from other causes to which the claimant and everyone else might have been exposed*. Stated otherwise, it means that the disease must originate from conditions in the employment that result in a hazard that distinguishes the employment in character from the general run of occupations.

In *Lee v. Schumpert*, 36,733, p. 10 (La.App. 2 Cir. 1/29/03), 836 2d 1214, 1220-21 (emphasis added) (citations omitted), the court described the burden of proof for a claimant asserting an occupational disease as follows:

> The claimant asserting an occupational disease must prove, by a preponderance of evidence, *a disability related to an employment-related disease, that it was contracted during the course of employment*, and *that it is the result of the work performed*. The causal link between the claimant's occupational disease and the work-related duties must be established by reasonable probability. The claimant will fail if there is only a possibility that the employment caused the disease, or if other causes not related to the employment are just as likely to have caused it. Expert testimony is required to support a finding of an occupational disease.[1]

In *Lee*, 836 2d at 1221, the court concluded that the claimant, an abstractor, had met this burden of proof for epicondylitis and carpal tunnel syndrome (CTS) as occupational diseases based upon the expert testimony of her physician "who repeatedly stated that her conditions were more probably than not related to her employment" and who agreed that "her conditions were 'due to causes and conditions

---

[1] In *Fite v. Louisiana Title Co.*, 02-2607 (La. 6/27/03), 852 So.2d 983, the supreme court concluded that *medical reports* may serve as the required *expert testimony* for proof of disputed medical matters.

characteristic of her employment,'" notwithstanding the doctor's occasional use of the word "possibility" in his testimony. Citing the quality of this evidence, the court distinguished *Lee* from another case, *Fite v. Louisiana Title Co.*, 36,393 (La.App. 2 Cir. 9/18/02), 828 So.2d 165 (emphasis added), in which the appellate court reversed a judgment in favor of a title abstractor claiming the same two conditions as occupational diseases.[2] The court in *Lee*, 836 So.2d at 1221, noted that *Fite* presented "the lack of evidence that the claimant was exposed to hazards peculiar to abstractors, and the lack of expert medical opinion that her job duties caused the CTS and epicondylitis."

Cingular argues that it proved that Ms. Chassion's epicondylitis cannot be considered as a characteristic of and peculiar to her employment as a CSR based upon Dr. Hutcheson's ergonomic analysis of the conditions at the Cingular call center where she worked. However, Dr. Hutcheson admitted at trial that he was not qualified to render a medical opinion on the causation of her injuries. Dr. Mayeux, however, was adamant that Ms. Chassion's condition was work-related and that it was characteristic of and peculiar to her employment as clerical worker who uses a telephone and a keyboard for data entry. Dr. Mayeux also provided testimony as to the incidence of epicondylitis in the clerical field by stating that, based upon her experience as an orthopedic surgeon, seventy-five to eighty percent of her epicondylitis patients are clerical workers. We find that Dr. Mayeux's testimony is similar to the testimony in *Lee*, 836 So.2d 1214, that was found to sufficiently support a claim of epicondylitis and CTS as occupational diseases characteristic of and

---

[2]Upon remand from the supreme court, the second circuit again ruled in favor of the employer in *Fite v. Louisiana Title Co.*, 36,393 (La.App. 2 Cir. 10/24/03), 859 So.2d 259, *writ denied*, 03-3230 (La. 2/20/04), 866 So.2d 829, citing one treating physician's lack of knowledge as to what the claimant's job entailed and the medical opinions of two other physicians that the claimant's symptoms were not work related.

peculiar to the employment of an abstractor. Accordingly, we find no error in the WCJ's acceptance of Dr. Mayeux's opinion over that of Dr. Hutcheson.

**Penalties and Attorney Fees**

In its second assignment or error, Cingular argues that the WCJ erred in awarding penalties and attorney fees, contending that it reasonably controverted the claim under La.R.S. 23:1201(F)(2) by hiring Dr. Hutcheson to perform an ergonomic analysis. In awarding a total of $6,000.00 in penalties and $7,000.00 in attorney fees, the WCJ characterized the employer's actions as "purely and simply defensive" in light of Dr. Mayeux's unambiguous diagnosis, stating that it "in no way comported with either the spirit or the law governing the treatment of injured workers. Preparing a defense is certainly proper, but it is not a substitute for an investigation."

> The determination of whether an employer should be cast with penalties and attorney fees is essentially a question of fact, and the trial court's finding must not be disturbed on appeal absent manifest error. "To avoid penalties and attorneys fees for the nonpayment of benefits, the employer or insurer is under a continuing duty to investigate, to assemble, and to assess factual information before denying benefits."

*Rose v. Maison Deville Care Center*, 05-1307, p. 5 (La.App. 3 Cir. 4/5/06), 927 So.2d 625, 628-29, *writ denied*, 06-1054 (La. 9/1/06), 936 So.2d 205 (citation omitted) (quoting *George v. Guillory*, 00-591, p. 13 (La.App. 3 Cir. 11/2/00), 776 So.2d 1200, 1209).

Cingular contends that it sufficiently investigated this claim by hiring Dr. Hutcheson and that its denial is supported by his conclusions. However, Dr. Hutcheson did not render his report until June of 2005, almost one year and a half after the claim was initially denied in December of 2003. In his oral reasons, the WCJ indicated that Dr. Mayeux's written opinion of September 30, 2004, that was forwarded to Cingular on October 5, 2004, should have prompted the employer to

8

send Ms. Chassion to its choice of physician, rather than to hire a non-medical expert who did not consult with her prior to trial. We find no error in this reasoning, given the emphasis that the jurisprudence places on medical evidence in occupational disease cases. Accordingly, the award of penalties and attorney fees is affirmed. We further award additional attorney fees of $1,500.00 for Ms. Chassion's defense of this appeal.

**Decree**

For the above reasons, the judgment of the Office of Workers' Compensation is affirmed and amended to award additional attorney fees of $1,500.00. Costs of this appeal are assessed to Defendant/Appellant, Cingular Wireless.

**AFFIRMED AS AMENDED.**