971 So.2d 342 (2007)
Cleuonia WINBORNE
v.
SANDERSON FARMS.
No. 2006 CA 2272.
Court of Appeal of Louisiana, First Circuit.
September 14, 2007.
Rehearing Denied November 7, 2007.
*343 J. David Smith, Baton Rouge, Counsel for Claimant/Appellant Cleuonia Winborne.
John T. Roethele, Denham Springs, Counsel for Defendant/Appellee Sanderson Farms.
Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
HUGHES, J.
This is an appeal from an action seeking workers' compensation benefits, which were denied. For the reasons that follow, we affirm.

FACTS AND PROCEDURAL HISTORY
On February 9, 2005, claimant, Cleuonia Winborne, filed a "Disputed Claim for Compensation" with the Office of Workers' Compensation (OWC). On that form, Ms. *344 Winborne stated that her "Date of Hire" was "X-____-XX," and that her "Date of Injury/Illness" was "8-10-04."[1] Ms. Winborne asserted that while working as a chicken "deboner" for the defendant, Sanderson Farms, in late July through August of 2004, she began to experience debilitating pain in her arms, forearms, and hands "to the point that she could no longer continue working."
Ms. Winborne was diagnosed with carpal tunnel syndrome in both hands and surgery was recommended; her activities were restricted pending surgery. Ms. Winborne alleged that when she reported back to Sanderson Farms with this information on August 12, 2004, she was fired.
Sanderson Farms asserted that Ms. Winborne's condition first arose when she was working for her previous employer, that the previous employer was responsible for payment of any workers' compensation benefits that were due, and that the claimant failed to overcome the presumption contained in LSA-R.S. 23:1031.1(D).
Following a hearing on July 6, 2006, the OWC judge ruled in favor of defendant and dismissed Ms. Winborne's claim. Ms. Winborne has appealed the ruling to this court, asserting the following assignments of error:
(1) The [OWC] erred by failing to determine if Appellant's employment at Sanderson Farms aggravated a pre-existing occupational disease resulting in manifestation of a disabling condition.
(2) The [OWC] erred by failing to consider whether Sanderson Farms was responsible for workers' compensation benefits if Appellant's employment therewith aggravated a pre-existing occupational disease.
(3) The [OWC] erred in failing to award workers' compensation benefits retroactive to the date of carpal tunnel diagnosis.
(4) The [OWC] erred in failing to award Appellant penalties and attorney fees for the employer/carrier failing to institute workers' compensation benefits after it had knowledge that the claim was compensable.

LAW AND ANALYSIS
The Workers' Compensation Act provides coverage to an employee for personal injury by accident arising out of and in the course of his employment. An employee must prove the chain of causation required by the workers' compensation statutory scheme as adopted by the legislature, and must establish that the accident was employment-related, that the accident caused the injury, and that the injury caused the disability. Clausen v. D.A.G.G. Construction, XXXX-XXXX, p. 2 (La.App. 1 Cir. 2/15/02), 807 So.2d 1199, 1201, writ denied, XXXX-XXXX (La.5/24/02), 816 So.2d 851. Initially, a workers' compensation claimant has the burden of establishing by a preponderance of the evidence that an accident occurred on the job and that he sustained an injury. Once the employee proves the occurrence of a work-related accident, he must next establish proof of a causal connection between the accident and the resulting injury by a preponderance of the evidence. *345 Proof by a preponderance of the evidence is sufficient when the evidence, taken as a whole, shows that the fact sought to be proved is more probable than not. Causation is not necessarily and exclusively a medical conclusion. It is usually the ultimate fact to be found by the workers' compensation judge based on all credible evidence. Id.
As in other cases, in reviewing the OWC judge's factual determinations, including whether the employee has discharged his burden of proof, this court is bound by the manifest error standard of review. Lafleur v. Alec Electric, XXXX-XXXX, p. 4 (La.App. 1 Cir. 12/30/04), 898 So.2d 474, 478, writs denied, XXXX-XXXX, XXXX-XXXX (La.4/8/05), 898 So.2d 1287, 1288; Moran v. G & G Construction, 2003-2447, p. 4 (La.App. 1 Cir. 10/29/04), 897 So.2d 75, 79, writ denied, 2004-2901 (La.2/25/05), 894 So.2d 1148. Under that standard of review, an appellate court may only reverse an OWC judge's factual determinations if it finds from the record that a reasonable factual basis for the finding does not exist, or that examination of the entire record reveals that the finding is clearly erroneous. Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Even though an appellate court may feel its own evaluations and inferences are more reasonable than those of the factfinder, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review where conflict exists in the testimony. Lafleur v. Alec Electric, XXXX-XXXX at p. 4, 898 So.2d at 478.
Prior to the legislative extension of workers' compensation coverage to include occupational diseases, a workers entitlement to compensation hinged on the occurrence of an "accident," which can only be established by the claimant's proof of an "identifiable precipitous event" that caused injury. While enlarging workers' compensation coverage to cases of occupational disease, LSA-R.S. 23:1031.1 retains the requirement that an employee establish that the disease arises from his work, i.e., from "causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." Thus, the claimant must show that he contracted the disease at issue during the course of his employment and that the disease was the result of the nature of the work performed. The causal link between a claimant's illness and his work-related duties must be established by a reasonable probability; the claimant fails in his burden of proof upon a showing of only a possibility that the employment caused the disease or that other causes not related to the employment are just as likely to have caused the disease. Dunaway v. Lakeview Regional Medical Center, 2002-2313, p. 5 (La.App. 1 Cir. 8/6/03), 859 So.2d 131, 134-5.
In the case sub judice, the OWC judge found that Ms. Winborne had failed to establish her right to workers' compensation benefits because she failed to rebut the statutory presumption applicable to her claim as contained in LSA-R.S. 23:1031.1(D), which provides, in pertinent part:
§ 1031.1. Occupational disease
A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received *346 personal injury by accident arising out of and in the course of his employment.
B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purpose of this Section.
* * *
D. Any occupational disease contracted by an employee while performing work for a particular employer in which he has been engaged for less than twelve months shall be presumed not to have been contracted in the course of and arising out of such employment, provided, however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by a preponderance of evidence. [Emphasis added.]
Carpal tunnel syndrome is considered an occupational disease; however, where the claimant has been employed for less than a year, there is a rebuttable statutory presumption under LSA-R.S. 23:1031.1(D) that the employment did not cause the carpal tunnel syndrome. This presumption can be overcome and the claimant can receive compensation if the claimant proves by a preponderance of evidence that the disease was contracted during her employment. See Killett v. Sanderson Farms, XXXX-XXXX, p. 6 (La.App. 1 Cir. 5/10/02), 818 So.2d 853, 859 (citing Thornell v. Payne and Keller, Inc., 442 So.2d 536, 541 (La.App. 1 Cir.1983), writ denied, 445 So.2d 1231 (La.1984)).
In ruling against the claimant in this case, the OWC judge gave the following reasons for judgment:
I can't get around Subsection D's specific reference to contracting a disease within the course and arising out of such employment. In other words, I have many situations I can recall where I'm dealing with an employer like Sanderson  and, in fact Sanderson specifically  where I have an employee who worked less than the 12-month presumptive period in the statute.
The main thing I struggle with in those cases is I don't have any previous reports, documentation, testimony of the same type problem. So I'm left to decide . . . what are the doctors saying about the probabilities of this happening within whatever timeframe we're talking about. . . .
In reviewing the evidence, it looks like the first report of any problem with the hands, it actually came on July 14, 2004. And this is in Exhibit P16. There's a  this is the little computerized printout of the nurse  I guess on-duty nurse visits. It was 7/14/2004 at 19:55 which would have been 7:55 p.m., and that corresponds with her testimony as far as she reported it to the night nurse.
But it's reporting problems of a swollen left thumb. It confirmed that she was given Aleve. So, I mean, that's the short timeframe that I'm having to struggle with. . . . The evidence suggests she started there either . . . late June, early July. There's a handwritten note that says her employment actually started *347 June 30, 2004. So, I mean, I'm dealing with a period of two weeks.[[2]]
And, you know, I guess the bigger problem is the medical evidence that I have in front of me. Dr. Acosta's report which is P7-B I'm referring to. The history is a little curious because according to his history and his narrative report, he states the following, "Chief complaint is pain in her arms and hands. She noticed it about one or two years ago when she would wake up in the middle of the night with her arms hurting;
"She noted she had pins and needles in the hands. She also notices that as time went on, she began dropping things. And she noticed that when it was cold outside, she would start hurting more in her forearms and in her arms. She said that she used to work as a produce helper and she could not do that since her arms were really hurting really bad so she stopped."
I mean, in that sense, the history almost sounds like she was aware of this problem in her hands and arms so much so that she had to quit the job as the produce helper.
Then Dr. Stokes . . . specifically notes the history dating back to November 2003. So, again, typically when I'm dealing with a 1031.1(D) case  in other words, the 12-month presumption case  I'm really just trying to figure out from date of employment forward could this repetitive type employment cause whatever you're suffering from now.
In this case, I don't find that she's met the burden by a preponderance under Subsection D because there's a fairly well documented prior history, you know, since at least November of 2003 up until when she was hired on at Sanderson Farms. And I think obviously the biggest hurdle that I have to overcome is Ms. Winborne's own testimony.
I mean, I guess the irony in my situation is she's an extremely credible person. But the problem is she's telling me that, yes, I was having these problems. I don't know, medically, you know, I'd have to rely on the doctors for that kind of thing. But I don't know that it's convincing me enough that you're describing one type of pain as a toothache type pain and one type of pain as a numbness.
In other words, the overriding factor for me I guess is she's telling me  she's telling at least one doctor these hand problems, let's just say, started at least seven months before her employment with Sanderson. So I guess for those reasons, I can't conclude that she's contracted as it says in Subsection D the carpal tunnel syndrome from working at Sanderson.
. . . And, again, you know, Ms. Winborne is extremely credible. But even just listening to the chronology of events as she's explaining it, it didn't do anything to tip the scale past the preponderance under Subsection D. It's like [counsel for Sanderson Farms] says . . . the Legislature says "contracted in the course of and arising out of such employment." . . . I don't find that she's met her burden under that standard.
*348 During the trial of this matter, Ms. Winborne testified regarding her job with Sanderson Farms and circumstances leading to her disability. She stated that it was her job to cut the wings of chickens as they came down a conveyor belt. Ms. Winborne stated that typically she cut up between 80 and 100 chickens per hour and between 800 to 1,100 chickens per her six to seven hour work day. Ms. Winborne also testified that her working environment at Sanderson Farms was very cold and that sometimes the chickens were frozen, making the job of cutting more difficult. Ms. Winborne pointed to her work activities of "grabbing" knives and chickens as causing her arms and hands to hurt. She stated that her hands would get cold and "ache like a toothache."
However, Ms. Winborne admitted that when she began working at Sanderson Farms in July of 2004 she already had problems with her hands and arms. When asked whether she ever experienced "that problem with [her] hands and arms" while working for Trabona's, Ms. Winborne responded, "Yes." Ms. Winborne indicated she began having problems with her hands in 2003. However, Ms. Winborne stated the pain she experienced at Trabona's and at Sanderson Farms was different:
At Trabona's, it was like just the deadness and the numbness. At Sanderson Farms, they ache[d] like a toothache. The coldness of it. I would go home at night and I had to actually  the only way I could get them to stop was to sit on them and warm them up. They would hurt so bad, I would cry.
Ms. Winborne testified that when her hands and arms bothered her at Trabona's, she could "shake it off a little and it [would] go away." Ms. Winborne never sought medical treatment for her condition while she was working at Trabona's. Ms. Winborne described her hand and arm condition at the time of trial as follows:
They tingles [sic] a lot. My hands never did stop tingling. They tingle 24 hours a day like they do now. But I'm so used to it that, you know, I'm just used to it. But they swelled a lot. I have to  my ring, I had to take it off because they just [swell] and get too tight. And by me trying to twist and get it off, it . . . caused a sore on my hand like I have now. They swelled a lot.
Every now and then they'll ache if they get cold. Like if I go in my refrigerator and get cold meat out or something, they will ache. But I take Aleve or Advil or something like that to stop it, you know. That's what I go through now.
Ms. Winborne further testified that after she left her employment with Trabona's in June of 2004 she was unemployed for approximately two weeks before going to work for Sanderson Farms. During that time, Ms. Winborne stated that her condition improved "because I didn't have the symptoms no more [sic]."
Ms. Winborne estimated that she first reported pain in her hands to Sanderson Farms via the "night nurse." The following day, Ms. Winborne went to her family physician, Dr. Kumar, who told her she had carpal tunnel syndrome and gave her pain medication. When she returned to work, the Sanderson Farms "day nurse" gave her "some more pills, [and] sent [her] back on the line." Ms. Winborne also testified that when she told Sanderson Farms that she had carpal tunnel syndrome on August 12th, she was fired.
Ms. Winborne was also treated by Dr. Joseph Acosta, who verified to her that she had bilateral carpal tunnel syndrome and recommended that she not "do any kind of activity until [she had] surgery." The *349 medical report and records of Dr. Acosta were introduced into evidence and contained a diagnosis of carpal tunnel syndrome and recommendation of surgery. While Dr. Acosta indicated in his medical report that Ms. Winborne's employment at Sanderson Farms may have aggravated her condition, he did not opine that her occupational disease was contracted as a result of this employment. See LSA-R.S. 23:1031.1(A). Dr. Acosta did not testify at trial.
The deposition of Dr. Harold Stokes, who examined Ms. Winborne as an independent medical examiner, was introduced into the record before the OWC. Based on the history obtained, his examination of the medical records, and his examination of Ms. Winborne, Dr. Stokes testified that he found it unlikely that Ms. Winborne's carpal tunnel syndrome developed from her work at Sanderson Farms. Dr. Stokes testified that the carpal tunnel syndrome was more likely to have been idiopathic[3] in nature because he stated that it is a common condition developed by women in their early forties, which is generally hormone related. Dr. Stokes did not associate the development of Ms. Winborne's carpal tunnel syndrome with either her employment at Trabona's or her employment at Sanderson Farms, but rather to other personal factors. However, Dr. Stokes admitted that Ms. Winborne's repetitive work activities could have aggravated her carpal tunnel syndrome. Dr. Stokes explained that a person with carpal tunnel syndrome will get symptoms under many different conditions, including reading a newspaper or driving a car.
In this case, the OWC judge ruled that Ms. Winborne failed to prove by a preponderance of the evidence that her carpal tunnel syndrome was caused by her employment with Sanderson Farms. After a thorough review of the testimony and evidence presented in this case, we are unable to say the OWC judge manifestly erred in this ruling. Because Ms. Winborne was able to show only a possibility that her Sanderson Farms employment contributed to her condition, she failed in the burden of proof required to overcome the presumption present in LSA-R.S. 23:1031.1(D). See Dunaway v. Lakeview Regional Medical Center, 2002-2313 at p. 5, 859 So.2d at 134-5. Therefore, we must affirm the judgment of the OWC in favor of Sanderson Farms.

CONCLUSION
For the reasons assigned, we affirm the judgment of the OWC, and assess all costs to appellant, Cleuonia Winborne.
AFFIRMED.
GUIDRY, J., dissents and assigns reasons.
GUIDRY, J., dissenting.
The issue in this case is whether the claimant's disease (carpal tunnel syndrome) is compensable as an occupational disease when the disease was pre-existing and symptomatic prior to the claimant's employment with the defendant employer, but only became disabling while the claimant was working for the defendant employer. The majority interprets La. R.S. 23:1031.1(D) as precluding the claimant's recovery of workers' compensation benefits because the evidence clearly establishes that her injury pre-existed her employment with the defendant employer; however, the majority improperly relies on only the first portion of La. R.S. 23:1031.1(D) in reaching its conclusion.
*350 The second portion of La. R.S. 23:1031.1(D) provides "however, that any such occupational disease so contracted within the twelve months' limitation as set out herein shall become compensable when the occupational disease shall have been proved to have been contracted during the course of the prior twelve months' employment by a preponderance of evidence." (Emphasis added). It is undisputed that the record shows, by more than a preponderance of the evidence, that Ms. Winborne contracted carpal tunnel syndrome during her prior twelve-month's employment with Trabona's IGA Food Store. Thus, in accordance with the plain language of the statute, Ms. Winborne's claim for her carpal tunnel syndrome became "compensable."
This conclusion that Ms. Winborne's claim for her carpal tunnel syndrome is compensable is further supported by this court's decision in Thornell v. Payne and Keller, Inc., 442 So.2d 536 (La.App. 1st Cir.1983), writ denied, 445 So.2d 1231 (La. 1984), in which case the claimant's doctors stated that the claimant contracted the disease during his prior employment, but nevertheless further opined that the current employment also contributed to the claimant's development of the disease. This court therefore held that since the claimant's disease became disabling during the most recent employment and there was evidence that the most recent employment was "a causative factor in the development" of the claimant's condition, the claimant was deemed to have contracted the disease during the most recent employment, as well as the prior employment. It was therefore held that the claim was compensable and the claimant's most recent employer was liable for the payment of workers' compensation benefits. See Thornell, 442 So.2d at 542-543 and 545-546.
Accordingly, based on the language of the statute and this court's Thornell opinion, I respectfully dissent from the decision rendered herein.
NOTES
[1] The claimant had worked for Trabona's IGA Food Store (Trabona's) between 2001 and July 2004, in the produce department, prior to working for Sanderson Farms. The claimant named Trabona's as a defendant in the OWC action. Ms. Winborne stated that the repetitive tasks she was required to perform in her job at Trabona's caused numbness and pain in her arms and hands, though not to such an extent as to keep her from working or to the degree later caused by her job at Sanderson Farms. Trabona's was dismissed from the OWC action pursuant to a settlement agreement with the claimant prior to trial.
[2] Evidence introduced into the record shows that Ms. Winborne worked the following hours for Sanderson Farms over the entire course of her employment: July 3, 2004 through July 9, 2004-15 hours; July 10, 2004 through July 16, 2004-23.8 hours; July 17, 2004 through July 23, 2004-28.2 hours; July 24, 2004 through July 30, 2004-31.9 hours; July 31, 2004 through August 6, 2004-23.4 hours; and August 7, 2004 through August 13, 2004-34.7 hours (for a total of 157 hours).
[3] "Idiopathic" means "a disease whose cause is unknown or uncertain." Webster's New World Dictionary, Third College Edition, p. 670 (1988).