# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #023

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **5th day of May, 2015**, are as follows:

**BY GUIDRY, J.**:

2013-C -2878    JAMES CLIFFORD ARRANT, ET AL. v. GRAPHIC PACKAGING INTERNATIONAL,
   C/W          INC., ET AL.  C/W  MARVIN JACK BARNETT, JR., ET AL. v. GRAPHIC
2013-C -2981    PACKAGING INTERNATIONAL, INC., ET AL. C/W KENNETH NOEL BAIN, SR.,
                ET AL. v. GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL. C/W
                GEORGE EMORY BUTLER, ET AL. v. GRAPHIC PACKAGING INTERNATIONAL,
                INC., ET AL. C/W W.H. AUTTONBERRT, ET AL. v. GRAPHIC PACKAGING
                INTERNATIONAL, INC., ET AL. C/W JIMMIE DEWAYNE BAUGH, ET AL. v.
                GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL. C/W MELVIN ELLIS
                BORDELON, ET AL. v. GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.
                (Parish of Ouachita)

Accordingly, the court of appeal properly reversed the judgment of the district court and dismissed the plaintiffs' claims. The judgment of the court of appeal dismissing the plaintiffs' tort claims with prejudice is affirmed.

JOHNSON, C.J., dissents for reasons assigned by Knoll, J.
KNOLL, J., dissents and assigns reasons.

05/05/15

# SUPREME COURT OF LOUISIANA

## NO. 2013-C-2878
## CONSOLIDATED WITH
## NO. 2013-C-2981

### JAMES CLIFFORD ARRANT, ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### MARVIN JACK BARNETT, JR., ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### KENNETH NOEL BAIN, SR., ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### GEORGE EMORY BUTLER, ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### W. H. AUTTONBERRY, ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### JIMMIE DEWAYNE BAUGH, ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### CONSOLIDATED WITH

### MELVIN ELLIS BORDELON, ET AL.
#### VERSUS
### GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
### SECOND CIRCUIT, PARISH OF OUACHITA

**GUIDRY, Justice**[*]

The instant case presents a res nova issue in this court of whether gradual noise induced hearing loss caused by occupational exposure to hazardous noise levels is a personal injury by accident or an occupational disease, or both, under the Louisiana Workers' Compensation Act (hereinafter, "LWCA"), thereby entitling the defendant employer to immunity from suits in tort under the exclusivity provisions of the LWCA. Interpreting the Act and mindful of the clear legislative purpose behind the workers' compensation scheme -- a principle that has been well-explained in our jurisprudence, we find occupational noise-induced hearing loss (hereinafter, "NIHL") falls squarely within the parameters of the LWCA, either the pre-1990 definition of "accident" or the post-1975 definition of "occupational disease." As explained below, we conclude the defendants were entitled to immunity from suits in tort under the LWCA. Accordingly, the court of appeal properly reversed the judgment of the district court and dismissed the plaintiffs' claims. For these reasons, we affirm the judgment of the court of appeal dismissing the plaintiffs' tort suits against the defendants.

**FACTS AND PROCEDURAL HISTORY**

Plaintiffs in these consolidated actions are current and former employees of the West Monroe facility, which includes a paper mill, box plant, and carton plant. The facility was owned by defendant Olin Mathieson Chemical Corporation from 1955 until 1967, when defendant Graphic Packaging International, Inc. assumed control of the facility and continues to exercise that control to this day. The plaintiffs, who are now elderly and many of whom are retired from working at the

---

[*] While Justice Scott J. Crichton was not on the Court at the time this case was argued, he now sits as an elected Justice and is participating in the rendering of this opinion.

2

facility, claim they have suffered hearing losses, primarily high frequency hearing losses, which they attribute to being exposed to hazardous levels of industrial noise during their employment with the defendant.[1]

---

[1] Hugh Malcolm Calhoun began working at the facility in 1956 until he retired in 1999. His first audiogram in 1975 showed normal hearing, but according to his own expert progressively worsened from 1975 until 1995. Twelve audiograms were conducted over the course of his employment. His hearing loss was asymmetrical, meaning it was measurable more so in only one ear. There was testimony that there were other possible causes of his hearing loss: age (presbycusis), recreational hunting, the use of a chainsaw, and driving a tractor. However, the trial court concluded that the daily, constant exposure for decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

Tommie Wayne Ford, born in 1945, began working at the facility in 1969, and except for two years, 1995-1997, he remains working at the facility. His first audiogram showed relatively good hearing, and he was tested numerous times over the years. There was testimony that he, too, had suffered asymmetrical hearing loss, with a notch in the left ear that could be explained by right-handed shooting, and that there were other risk factors for causing the loss: age, hunting without hearing protection and using a chainsaw. However, the trial court concluded that the daily, constant exposure for decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

Jerry Lewis Hall, born in 1946, began working at the facility in 1964, and continued working there until 2004, except for two years of military service. His first audiogram revealed hearing within normal limits in all frequencies, and numerous tests were conducted over the years. There was a significant shift in his hearing between 1975 and 2007, according to his own expert. Although there was testimony as to other risk factors (hunting without ear protection, using a chainsaw, presbycusis), the trial court concluded that the daily, constant exposure for decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

Ronald Edward Levy, born in 1945, worked at the facility from 1972 until he retired in 2007. His first audiogram, performed pre-employment in 1972, showed some asymmetry hearing loss in both ears. He was tested again in 1974 and more frequently in the 1990s. He was diagnosed with some high frequency hearing loss and tinnitus (ringing in the ears). Although there was testimony as to other risk factors (hunting and using a chain saw and Skil saw, all without ear protection, and age), the trial court concluded that the daily, constant exposure for decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

Vernice Joseph Pleasant, Jr., born in 1942, worked at the facility from 1967 until he retired in 2004. His first audiogram was performed in 1974 and revealed some high frequency hearing loss; he was tested a number of times over the years. He was diagnosed with asymmetrical hearing loss for high frequencies. Although there was testimony that he hunted, used power tools and a leaf blower, all without ear protection, the trial court concluded that the daily, constant exposure for decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

Roy Glenn Robert, born in 1941, worked at the Adams Paper mill from 1962 until 1968, when he began working at the Graphic Packaging facility until he retired in 2004. His first audiogram in 1982 showed some shift in hearing, but he was not retested; later tests did not reveal this shift. At any rate, a 1991 test revealed high frequency hearing loss, with some asymmetry. Like the other plaintiffs, there was testimony that he hunted and used various saws, all without ear protection; however, the trial court concluded that the daily, constant exposure for

3

In 2005, 2007, and 2008, the plaintiffs filed various suits against the defendants for hearing losses allegedly sustained as a result of being "occupationally exposed to hazardous levels of industrial noise." Specifically, plaintiffs asserted negligence on the part of the defendants for failing to provide a safe place to work, which in turn caused plaintiffs to suffer hearing loss by gradual, but persistent, noise exposure occurring over a substantial period of time while employed by defendants. The defendants filed, inter alia, exceptions of prescription and a motion for summary judgment asserting immunity from tort under the LWCA. The exceptions and motion were denied, and the matter proceeded to trial as a tort suit.

After a lengthy bench trial, the district court found in favor of the plaintiffs and awarded damages. The district court in detailed written reasons found that plaintiffs had established by a preponderance of the evidence that the constant exposure to hazardous levels of industrial noise while employed by the defendants was a substantial and significant cause-in-fact of their hearing losses and any other potential cause paled in comparison. The district court further concluded the plaintiffs had suffered permanent and irreversible loss of hearing in varying degrees affecting every aspect of their lives. The court further stated that, although various devices, including hearing aids, may help in a given situation, they would not replace the loss of natural hearing. Although the district court was aware that each individual plaintiff must be awarded damages according to his particular facts and circumstances, the district court found uniformity of the damage awards was mandated by the evidence. Accordingly, and given the plaintiffs' stipulation to the recovery of no more than $50,000 per claim, the district court awarded $50,000 in

decades to hazardous levels of industrial noise was a substantial and significant cause in fact of his hearing loss.

damages to each plaintiff, together with legal interest from the date of judicial demand until paid.

The court of appeal reversed the judgment of the district court, having found that noise-induced hearing loss is an "occupational disease" under the LWCA, namely La. Rev. Stat. 23:1031.1, and that defendants were entitled to the tort immunity provided to employers under the Act. *Arrant v. Graphic Packaging Intern., Inc.*, 48,197 (La. App. 2 Cir. 9/25/13), 127 So.3d 924. The court of appeal noted that an occupational disease has been defined as the result of a series of events, often imperceptible in nature, which are eventually evidenced in the manifestation of a disability, citing *Vargas v. Daniell Battery Mfg. Co.*, 93-1249 (La. App. 1 Cir. 5/20/94), 636 So.2d 1194. The court then found that plaintiffs suffered NIHL which, as shown by the evidence, resulted from the cumulative damage or stress process upon the ear caused by constant exposure to excessively loud noises. Thus, the court found the record evidence sufficient to meet the requirements for finding that gradual hearing loss caused by excessive noise is an "occupational disease" under La. Rev. Stat. 23:1031.1(B). The court reasoned that a causal link between the plaintiffs' hearing loss and their work-related duties had been established by a reasonable probability by the plaintiffs' own testimony and that of their experts. The court further found that NIHL was compensable under the LWCA, rejecting the plaintiffs' contention the LWCA provided no remedy and therefore they were entitled to pursue a remedy in tort. The court reasoned that the compensation to be provided is dependent upon the proof of disability or impairment of function and its relation to the occupational disease. The court explained, "Upon proof of impairment of function, Plaintiffs are entitled to compensation under the LWCA, even if only under La. R.S. 23:1203, which obligates the employer to furnish medical and vocational rehabilitation expenses,

5

prosthetic devices and other expenses." *Arrant*, p. 15, 127 So.3d at 933. The court of appeal ultimately reversed the judgment of the district court in favor of plaintiffs, finding that plaintiffs' sole remedy was in workers' compensation.

The plaintiffs sought writs, asserting the court of appeal erred in finding that NIHL was a compensable "occupational disease" within the meaning of the LWCA. The defendants also sought writs, asserting inter alia that the court of appeal erred in not finding that NIHL also qualifies as an "accident by personal injury" within the meaning of the LWCA and that the district court erred in overruling the defendants' exceptions of prescription. Because these issues appear to be res nova in this court, and a split amongst the circuit courts arguably exists as to whether NIHL is a covered "accident" and/or "occupational disease" within the meaning of the LWCA, we granted both writ applications. *Arrant v. Graphic Packaging Intern., Inc.*, 13-2878, 13-2981 (La. 4/17/14), 138 So.3d 613, 614.

**LAW and DISCUSSION**

These consolidated cases require us to determine whether the NIHL is a covered "personal injury by accident" and/or an "occupational disease" within the meaning of the LWCA in its various configurations over the years. Thus, we are called upon to interpret the applicable versions of the Act itself. The guidelines for doing so have been well-established.

The starting point for interpretation of any statute is the language of the statute itself. *Rando v. Anco Insulations, Inc.*, 08-1163 (La. 5/22/09), 16 So.3d 1065; *Touchard v. Williams*, 617 So.2d 885 (La. 1993). When a law is clear and unambiguous and its application does not lead to absurd consequences, the law is applied as written, and no further interpretation may be made in search of legislative intent. La. Civ. Code art. 9. However, when the language of a law is

6

susceptible to different meanings, it must be interpreted as having the meaning that best conforms to the purpose of the law, and the meaning of ambiguous words must be sought by examining the context in which they occur and the text of the law as a whole. La. Civ. Code art. 10. The latter principle was explained in *Fruge v. Muffoletto*, 242 La. 569, 137 So.2d 336 (1962):

> In construing a statute, the primary object is to ascertain and, if possible, give effect to the intention and purpose of the legislature as expressed in the statute. Since the meaning is to be determined from a general consideration of the act as a whole, all parts, provisions or sections must be read together; each must be considered with respect to, or in the light of, all the other provisions, and construed in harmony with the whole. The intent as deduced from the whole will prevail over that of a particular part considered separately. Meaning should be given, if possible, to each and every section, and the construction placed on one portion should not be such as to obliterate another; so, in determining the meaning of a word, phrase or clause, the entire statute is to be considered.

*Fruge*, 137 So.2d at 339; *see also Rando, supra,* pp. 8-9, 16 So.3d 1075; *O'Regan v. Preferred Enterprises, Inc.*, 98-1602 (La. 3/17/00), 758 So.2d 124. Ultimately, the words of a law must be given their generally prevailing meaning and words of art and technical terms must be given their technical meaning when the law involves a technical matter. La. Civ. Code art. 11.

When courts interpret provisions of the Workers' Compensation Act, the basic history and policy of the compensation movement must be taken into account. *Rando, supra,* pp. 8-9, 16 So.3d 1075 (citing *Stelly v. Overhead Door Company of Baton Rouge*, 94-0569 (La. 12/8/94), 646 So.2d 905; *Roberts v. Sewerage & Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So.2d 341, 345). Although we must liberally construe the coverage provisions of the workers' compensation act, we must be mindful to narrowly construe the LWCA's immunity provisions. *Id.*

7

Given that we must interpret the provisions of the LWCA in light of the history and policy behind the workers' compensation scheme, we commence our review with a brief overview of the history of workers' compensation law in Louisiana and the purpose behind such legislation. The history of the LWCA was set forth in detail in *Rando*, pp. 9-14, 16 So.3d at 1076-79. Recognizing that the judicial system for remedying personal injuries for workers via a tort suit posed significant hurdles for the injured employee, the legislature passed the Burke-Roberts Employers' Liability Act in 1914. La. Acts 1914, No. 20; s*ee generally* H. Alston Johnson, *Louisiana Workers' Compensation Law and Practice*, 13 La. Civ. Law Treatise, pp. 6-35 (5th ed. 2010) (hereinafter, "Malone & Johnson"). Since 1914, Louisiana has provided workers' compensation coverage for "personal injury by accident arising out of and in the course and scope of [the worker's] employment…." La. Acts 1914, No. 20; *see* La. Rev. Stat. 23:1031(A).[2] This compensation scheme, which continues to this day, represents the legislature's attempt to achieve a compromise regarding the rights and responsibilities of injured workers and their employers. The 1914 Act provided that employees injured in the course and scope of their employment could pursue legislatively-defined compensation benefits without having to prove fault on the part of the employer, and necessarily forego their right to full redress for personal injuries under Article 2315 of the Civil Code. The employer, in exchange for accepting the responsibility to pay such benefits regardless of fault, was guaranteed immunity from suits for tort damages arising out of the employment relationship, save for

---

[2] La. Rev. Stat. 23:1031(A), setting forth the employee's right of action, provides as follows:

> A. If an employee not otherwise eliminated from the benefits of this Chapter receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation in the amounts, on the conditions, and to the person or persons hereinafter designated.

intentional torts. Sometimes referred to as a "quid pro quo," this initial core compromise has evolved over the years and has been modified by the legislature, which has the prerogative to define the conditions and limitations under which workers can recover compensation benefits. *O'Regan v. Preferred Enterprises, Inc.*, 98-1602 (La. 6/29/99), 737 So.2d 31, 34.

In 1918, La. Rev. Stat. 23:1021 was amended to define the terms "accident" and "personal injury":

> (1) "Accident" means an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury. …

> (7) "Injury" and "Personal Injuries" includes only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, howsoever caused or contracted.

Recognizing the realities of the modern workplace, a liberal interpretation evolved regarding what constitutes an "accident" under the LWCA. For example, the jurisprudence has established that physical breakdowns caused by repeated exposures to conditions at work are "accidents" within the purview of the LWCA. This court addressed these cases and the proper interpretation of the LWCA's accident provisions in *Rando v. Anco Insulations Inc.*, p. 11, 16 So.3d at 1077:

> While the purpose of the 1914 statute may have initially been to cover only work-related "accidents," with the advancement of the industrial revolution and growing number and types of diseases arising from work-related activities, a liberal interpretation was given to the statute which "effectuated its beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce." *Parks v. Insurance Co. of North America*, 340 So.2d 276, 281 (La. 1976). Accordingly, this Court recognized judicial interpretation of that statute often resulted in occupational illnesses and diseases being classified as "accidents" under the Act. *Id.*

9

In 1952, the legislature established express statutory authority for the coverage of occupational diseases under Louisiana's workers' compensation law. 1952 La. Acts No. 532. Rejecting blanket coverage for all occupational diseases, the legislature chose a schedule approach, providing compensation for "contraction of an occupational disease," as defined, as the exclusive remedy of the employee or his dependent. The statute explicitly provided coverage for two categories of "occupational disease." La. Rev. Stat. 21:1031.1 (1952). One category included specifically listed diseases, namely diseased conditions caused by exposure to X rays or radioactive substances, asbestosis, silicosis, dermatosis, and pneumoconiosis, while the other category identified diseases by causative agents. *Rando*, p. 12, 16 So.3d at 1078. The defendants do not argue that NIHL is an occupational disease within the meaning of the 1952 version of La. Rev. Stat. 21:1031.1 (1952).

In 1975, it became apparent that a considerable number of employment-related diseases did not comfortably fit into the categories set forth in the 1952 amendment. *Rando*, pp. 13-14, 16 So.3d at 1078-79. The legislature revised La. Rev. Stat. § 23:1031.1(A) (1976) to amend the definition of occupational disease by removing the list of specific diseases for which there was coverage under workers' compensation and substituting the following: "[a]n occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." 1975 La. Acts No. 583. We have recognized that the legislature, by amending the LWCA in 1975, intended to abandon the limited schedule approach to occupational diseases set forth in 1952, and to embrace a broader and more expansive definition of "occupational disease." *See Rando*, p. 16, 16 So.3d 1080; *see also O'Regan v.*

*Preferred Enterprises, Inc.*, 98-1602 (La. 3/17/00), 758 So.2d 124. Originally, La.

Rev. Stat. 23:1031.1 provided as follows:

> A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
>
> B. An occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.

In 1989, the legislature again amended the definition of "occupational disease" to exclude certain conditions:

> B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. *Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purposes of this Section.*

Acts 1989, No. 454, § 2, eff. Jan. 1, 1990 (emphasis supplied).

But in 1990, the legislature clarified that "carpal tunnel syndrome" is an

occupational disease. La. Acts 1990, No. 943, § 2. Such that the definition of

occupational disease currently reads as follows:

> A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
>
> B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. *Occupational disease shall include injuries due to work-related carpal tunnel syndrome.* Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically

11

excluded from the classification of an occupational disease for the purpose of this Section.

La. Rev. Stat. 23:1031.1 (emphasis supplied).

After recognizing that an "occupational disease" includes repetitive injuries that result in a gradual deterioration or progressive degeneration, such as carpal tunnel syndrome, the legislature has also revised the definition of "accident." Acts 1989, No. 454, § 1, eff. Jan. 1, 1990. Since 1990 then, "accident" has been defined as follows:

> (1) "Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.

La. Rev. Stat. 23:1021(1) (2014). The defendants do not specifically argue that NIHL falls within this definition of "accident."

Looking at the history and purposes behind the Act, it is evident that central to the effectuation of the economic principle that underpins Louisiana's compensation system is the existence of a causal link between an injury and the employment enterprise. The Act's "beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in the channels of commerce," *Parks v. Insurance Co. of North America*, 340 So.2d 276, 281 (La. 1976), is furthered only when the particular risks that materialize are indeed attributable to the enterprise. Causality is thus the lynchpin for distinguishing between acts that fall within the ambit of the Act and those that do not.

The centrality of this causal link is recognized and underscored in the language of the Act itself. Thus, La. Rev. Stat. 23:1031(A) provides the employer is responsible for compensation benefits to "an employee not otherwise eliminated from the benefits of this Chapter [who] receives personal injury by accident *arising*

12

*out of and in the course of his employment.*" (Emphasis added.) In *O'Regan v. Preferred Enterprises, Inc.*, 98-1602 (La. 3/17/00), 758 So.2d 124, we recognized that the highlighted words "were carefully chosen by the Legislature" to aid the courts in deciding "the threshold issue of whether the particular risk involved falls within the protection of the compensation act," and "that these phrases are the lynchpin to an injured employee's entitlement to compensation under the Workers' Compensation Act." *O'Regan*, 98-1602 at 9-10; 758 So.2d at 131. Thus, we added, "[i]t is no surprise that when the Legislature broadened the concept of 'accident' by providing for occupational diseases in the workers' compensation system, it engrafted the same phrases in its treatment of occupational diseases" in La. Rev. Stat. 23:1031.1(A) and (B). *Id.*, 98-1602 at 11; 758 So.2d at 132. "Generally," we noted, "an employee who becomes disabled because of an occupational disease will be entitled to workers' compensation benefits [as] 'if said employee received personal injury by accident arising out of and in the course of his employment,'" (La. Rev. Stat. 23:1031.1(A); emphasis removed), if "the employee has performed work for a particular employer in which he has been engaged for more than twelve months," (La. Rev. Stat. 23:1031.1(D)), "and he can show by a preponderance of the evidence that the 'disease or illness ... is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease,'" (La. Rev. Stat. 23:1031.1(B)). *Id.* We reasoned: "Seen in this light, the occupation[al] disease section is essentially concerned with the claimant's proof that there is a relationship between the employment and his disease, to the extent that we think it is fair that the employment enterprise should bear the cost of his disability." *Id.*, 98-1602 at 13; 758 So.2d at 133. In other words, in *O'Regan* we recognized that the language the legislature adopted in expanding the statutory

13

definition of occupational disease points to causation as the central determinant in assessing which risks are properly institutionalized as risks of employment and which risks properly remain in the tort system.

As we reiterated in *Breaux v. Hoffpauir*, 95-2933 (La. 5/21/96), 674 So.2d 234, the provisions of the Act must be liberally construed to effectuate the overarching policies behind the LWCA, that is, to keep the injured employee from destitution and to effectuate the remedial policy of the Act. With this history and purpose in mind, we turn to the specific issues presented.

*"PERSONAL INJURY BY ACCIDENT"*

For the reasons set forth below, we find that noise-induced hearing loss qualifies as a "personal injury by accident" within the meaning of La. Rev. Stat. 23:1021(1), at least until the definition of "accident" was revised in 1990.[3] At the time of the plaintiffs' alleged exposure to hazardous levels of noise, "accident" was defined as "an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury," while a personal injury was defined as "only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom." La. Rev. Stat. 23:1021(1) (1952).

In support of their argument that NIHL does not constitute a "personal injury by accident" under the LWCA, the plaintiffs point to several cases that seemingly so hold. In *Becker v. Murphy Oil Co.*, 10-1519 (La. App. 4 Cir. 6/2/11), 70 So.3d

---

[3] We need not decide whether NIHL falls within the definition of "accident" since the 1990 revision of La. Rev. Stat. 23:1021(1), because, as discussed below, we also find that, since 1975 at least, NIHL is a covered "occupational disease." Accordingly, the distinction between injury and disease may no longer be relevant for purposes of providing compensation for hearing loss indisputably arising out of industrial employment. Employment-related gradual hearing loss may be compensable under a repeated and cumulative impact theory of accidental injury or as an occupational disease. *See Marie v. Standard Steel Works*, 319 S.W.2d 871, 878 (Mo. 1959).

14

885, *writ denied*, 11-1750 (La. 11/23/11), 76 So.3d 1154, the court held that gradual hearing loss resulting from occupational noise over a period of many years does not meet the definition of an "accident" under any version of the LWCA. The court reasoned that no prior case had granted an employee workers' compensation benefits for gradual hearing loss due to occupational noise exposure, nor had any case specifically held that gradual hearing loss is a compensable "accident" under the LWCA. *Id.* Thus, the *Becker* court merely distinguished cases cited by the defendants therein, and did not conduct its own analysis of whether NIHL could qualify as a compensable "accident" under our jurisprudence and the facts of that case. Two subsequent courts have cited *Becker*'s holding approvingly, but with no further analysis. *Barbe v. American Sugar Refining, Inc.*, 11-0544 (La. App. 4 Cir. 12/14/11), 83 So.3d 75; *McCarthy v. Entergy Gulf States, Inc.*, 11-600 (La. App. 3 Cir. 12/7/11), 82 So.3d 336.

On the other hand, the defendants point to this court's jurisprudence, summarized in *Rando*, *supra*, in which the court noted that numerous courts have held that physical breakdowns caused by repeated exposures to conditions of employment were accidents under the LWCA. The defendants point to several cases which seemingly hold that gradual noise-induced hearing loss could be deemed an "accident" compensable under the LWCA. In *Chatelain v. American Can Co.*, 344 So.2d 1180 (La. App. 4th Cir.1977), the court ultimately found the plaintiff had failed to prove that his gradual hearing loss was causally related to his employment, but the court nevertheless had reasoned that "extraordinary stress and strain is not essential to the definition of a disabling accident." The *Chatelain* court went on to note that "[i]t is well established in Louisiana that when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are

15

present." 344 So.2d at 1181. Likewise, the defendants point to *Quine v. Ideal Cement Co.*, 351 So.2d 1303 (La. App. 1ˢᵗ Cir. 1977), *writ denied*, 353 So.2d 1035 (La. 1978), in which the court, although it found the plaintiff had failed to prove causation with regard to her hearing loss, nonetheless recognized that "[i]t is only necessary that the accidental injury be caused or precipitated by the usual or customary actions, exertion, or other factors directly connected with employment."

Our jurisprudence interpreting what constitutes a compensable "accident" under the LWCA has been well settled, and as we have pointed out, causation is the lynchpin in determining whether an act is covered. As we explained in *Parks, supra*, 340 So.2d at 281:

> [T]he courts of this state have consistently accorded the terms of the Workmen's Compensation Act a liberal construction in order to effectuate its beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce. *Danielsen v. Security Van Lines, Inc.*, 245 La. 450, 158 So.2d 609 (1963); *Geist v. Martin, Decker Corp.*, 313 So.2d 1 (La.App.1st Cir. 1975). Louisiana is among the many jurisdictions that look to the employee to determine whether there was an unexpected and catastrophic effect upon him in deciding that an injury is accidental. *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La. 1972). We have held that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La. 1972); *Bertrand v. Coal Operators Casualty Co.*, 253 La. 1115, 221 So.2d 816 (1968). More particularly, we have recognized that the fact that a condition may commonly be referred to as an illness or disease does not thereby preclude its classification as an accident. *Jennings v. Louisiana Southern Life Insurance Co.*, 290 So.2d 811 (La. 1974). In *Jennings*, we noted that among other conditions frequently termed as diseases, heart disease, stroke, heat stroke, herpes zoster (shingles), cancer and 'bends' have all been treated as compensable accidents within the contemplation of the Workmen's Compensation Act.

In *Parks*, the court had to determine whether plaintiff's bronchitis episode constituted an "accident" as that term is defined in the compensation act and

interpreted in the jurisprudence. The court reasoned the medical testimony established that the plaintiff's bronchitis episode resulted in an injury, that is, "violence to the physical structure of her body." The court found the injury to be accidental because it was unexpected and unforeseen and occurred suddenly producing at the time objective symptoms. The *Parks* court relied on *Geist v. Martin Decker Corp.*, 313 So.2d 1 (La.App.1st Cir. 1975), and *Gotte v. Cities Service Oil Co.*, 298 So.2d 920 (La.App.3d Cir. 1974), wherein hepatitis and pneumonia were both held, respectively, to be within the statutory definition of accident when the contraction of these conditions was causally related to plaintiffs' employment.

Finally, the *Parks* court found that the bronchitis contracted by plaintiff was caused, aggravated or precipitated by the working conditions of her employment. The *Parks* observed that it is not necessary that an accident be caused by extraordinary activities of an employee or that said activities be the exclusive cause of an accidental injury, it is only necessary that the accidental injury be caused or precipitated by the usual and customary actions, exertion, or other factors directly connected with the employment. 340 So.2d at 281 (citing *Roussel v. Colonial Sugars Co.*, 318 So.2d 37 (La.1975)). The *Parks* court went on to reason that it was "immaterial that the disability could have been brought on by causes other than a work-related trauma, if, in fact, trauma on the job which meets the standards of accidental injury is a disabling factor." *Id.* (citing *Bertrand v. Coal Operators Casualty Co.*, 253 La. 1115, 221 So.2d 816 (1969)). The *Parks* court further noted a prior case in which the court held "that an accident which aggravates or accelerates a pre-existing condition is compensable even where disability is not caused by a single or specific incident." *Id.* (citing *Chism v. Kaiser Aluminum & Chemical Corp.*, 332 So.2d 784 (La.1976)).

Turning to the instant case with these analytical principles in mind, it is evident none of the courts cited by plaintiffs has necessarily examined whether NIHL as alleged in this case, falls within the definition of a "personal injury by accident" as it has been expansively interpreted under this court's jurisprudential understanding of the history and purposes of the LWCA. The record evidence establishes that NIHL results from years of exposure to excessive noise. Plaintiffs' expert in audiology, Dr. Ross Roeser, explained the anatomical structure of the ear, as well as a discussion of the nerves that carry sound to the brain. He testified that the snail-shaped structure is the auditory portion of the inner ear called the cochlea. He explained the cochlea has two and a half turns, which, if unrolled longitudinally, could be said to be "tonotopically" organized. He explained that "tonotopically" means each distinct anatomical part is responsible for a different frequency, and high frequencies of sound are heard close to where the mechanical force enters the cochlea. This is consistent with Dr. Roeser's testimony in a previous NIHL case, in which he explained that, when a high level of energy enters the cochlea "it literally destroys, it damages and destroys that row of hair cells in that particular part of the ear." *See Becker v. Murphy Oil Corp.*, pp. 27-28, 10-1519 (La. App. 4 Cir. 6/2/11), 70 So.3d 885, 903. Thus, there is an immediate injury to the inner ear, even though the effect of the damage thereto only gradually becomes perceptible over time and only with repeated or continuous exposures to the hazardous levels of noise. In this regard, the excessive noise is a traumatic injury to the ear. This is not a long-latency occupational disease case. *Compare Austin v. Abney Mills*, 01-1598 (La. 9/4/02), 824 So.2d 1137. The damage to the inner ear is immediate, though imperceptible until the damage cumulates into a measurable hearing shift or loss.

18

Such traumatic damage to the inner ear certainly qualifies as an "injury" within the meaning of the LWCA, because the high levels of energy noise entering the ear cause damage to the inner ear "by violence to the physical structure of the body," i.e., the hairs and cells in the inner ear. Furthermore, the exposure to hazardous levels of industrial noise, as alleged by the plaintiffs, qualifies as an accident because the hazardous level of industrial noise, a large quantity of energy that did violence and damage to the inner ear, was an "unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury." As to the element of causation, which we have explained is the lynchpin of the workers' compensation scheme, the trial court found, based on the evidence, that the hazardous levels of noise to which the plaintiffs were exposed during their employment was a substantial and significant cause of their hearing loss. As we have reiterated, "when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present." *Parks, supra*. The record, including the testimony of the plaintiffs and their experts, establishes that the performance of the plaintiffs' usual and customary duties at the defendant's facility in fact caused or contributed to the breakdown and damage to their inner ears, and thus was the cause of their gradual noise-induced hearing losses. Accordingly, we find the statutory requirements of an accident have been satisfied.

*"OCCUPATIONAL DISEASE"*

We further find, for the reasons set forth below, that the plaintiffs' gradual noise-induced hearing loss as a result of their exposure to hazardous levels of noise in the course and scope of their employment constitutes an "occupational disease"

19

within the meaning of the LWCA. As noted above, the legislature in 1975 revised La. Rev. Stat. 1031.1(B) to abandon the schedule approach in favor of more expansive and comprehensive coverage to include employment-related ailments that did not fit within the schedule of diseases and were not by the Act's definition an accidental injury under La. Rev. Stat. 23:1021. The question then is whether NIHL is a "disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." La. Rev. Stat. 23:1031.1(A).

Mindful of the "comprehensive" nature of the coverage the statute now provides, we must give the terms "disease or illness" a common and "generally prevailing" definition. There can be little doubt that hearing is a vital function of the body; indeed, it is one of the five senses. While one may be able to live successfully without being able to hear, the trial court itself concluded the plaintiffs had suffered permanent and irreversible loss of hearing in varying degrees "affecting every aspect of their lives." Hearing loss has been included within the meaning of the term "occupational disease." *Black's Law Dictionary* defines "occupational disease" as follows:

> A disease that is contracted as a result of exposure to debilitating conditions or substances or exposure to debilitating conditions or substances in the course of employment. Employees who suffer from occupational diseases are eligible for workers' compensation. ***Courts have construed the term to include*** a variety of ailments, including lung conditions (such as asbestosis or black lung), ***hearing loss***, and carpal tunnel syndrome. [Emphasis added.]

*Black's Law's Dictionary*, "Occupational Disease" (10th ed. 2009).

Hearing loss also is encompassed by other definitions of disease or illness. *See Merriam-Webster.com*, "Disease" (9/10/14) ("A condition that prevents the body or mind from working normally."); *Oxforddicitionaries.com.* "Disease"

(9/10/14) ("A disorder of structure or function of a human, ... especially one that produces specific signs or symptoms or that affects a specific location and is not simply the result of physical injury."); *Black's Law Dictionary*, "Disease" (6th ed. 1990) ("Deviation from the healthy or normal condition of any of the functions of the body."). Unquestionably, hearing loss is a "condition", "disorder", and "deviation" from the normal functioning of the body. Furthermore, MERRIAM-WEBSTER, defines "illness," (medically) as "an unhealthy condition of body or mind." Merriam-Webster.com. Surely, hearing loss is an unhealthy condition of the body, which meets the medical definition and, therefore, the "generally prevailing meaning" of "illness."

Furthermore, as the statute directs, we must look to whether plaintiffs' disease or illness "is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed." La. Rev. Stat. 23:1031.1(B). The legislature deliberately chose very broad and expansive words to determine whether a disease or illness is a compensable "occupational disease" under the Act. By definition, "[a]n occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease." La. R.S. 23:1031.1(B). In other words, an occupational disease is one in which there is a demonstrated causal link between the particular disease or illness and the occupation. *See O'Regan, supra*.

Viewed in this light, it is clear that NIHL meets the statutory definition of an "occupational disease" under the Act. The court of appeal correctly found that a causal link between plaintiffs' hearing losses and their work-related duties was

established by a reasonable probability by the plaintiffs' own testimony and that of their experts. As the trial court found, and the record evidence supports, the "occupational disease" was contracted during the course of employment and was the result of the nature of the employment. There is no requirement in the statute, as the plaintiffs suggest, that the nature of the disease or injury be unique to the particular trade or industry. Here, hazardous levels of industrial noise, which caused the plaintiffs' hearing loss, was a condition very characteristic of and peculiar to the particular employment of working in a paper mill or box plant, which the evidence demonstrated involves machinery and processes producing high levels of industrial noise. Additionally, as the court of appeal noted, expert testimony in the form of certified reports, depositions or direct examination in open court supported a finding that the hearing loss was an occupational disease caused by exposure to high levels of industrial noise at the facility. Thus, the court of appeal correctly concluded the evidence established the plaintiffs' hearing loss "is due to causes and conditions characteristic of and peculiar to" plaintiffs' particular trade, occupation, process or employment with the defendants. *Arrant v. Graphic Packaging Intern., Inc.,* 48,197 at pp. 11-12 (La. App. 2 Cir. 9/25/13), 127 So.3d 924, 931.

The plaintiffs argue there must be a disability or impairment to the worker so as to be compensable as a disease or illness under the Act, citing La. Rev. Stat. 23:1031.1(A), which allows benefits to an "employee who is disabled because of the contraction of an occupational disease as herein defined…." We disagree with the plaintiffs' attempt to define "disability" so narrowly. There can be no doubt that hearing loss is a disability. Indeed, the legislature recognized as much when it specifically provided for a partial permanent disability benefit for hearing loss occasioned by a single traumatic accident. *See* La. Rev. Stat. 23:1221(4)(p); *see*

*also* La. Rev. Stat. 33:2581.1 (providing for a disability benefit for firefighters whose hearing loss is more than 10% greater than that in the comparable civilian population). That the injured worker may or may not be able to continue his employment to be entitled to temporary or total disability benefits, or to supplemental earnings benefits, is a matter of proof at trial. If the Legislature had intended La. R.S. 23:1031.1(B) to require the element of the impairment to a vital function, it would have included such in the definition of "occupational disease." It did not. Our conclusion is supported by the fact the courts have traditionally awarded benefits for occupational diseases for impairments to functions not traditionally considered vital to human existence. *See, e.g.*, *Winborne v. Sanderson Farms*, 06-2272 (La. 9/14/07), 971 So.2d 342 (carpal tunnel syndrome); *Lollis v. Shaw Global Energy Services*, 07-0395 (La. App. 3 Cir. 1/3/07), 966 So.2d 1122 (allergic contact dermatitis); *Chaisson v. Singular Wireless*, 06-691 (La. App. 3 Cir. 11/2/06), 943 So.2d 591 (epicondylitis, a/k/a tennis elbow); *Mitchell v. Alliance Compressors*, 05-1186 (La. App. 3 Cir. 4/5/06), 926 So.2d 127 (thoracic outlet syndrome); *Rodriguez v. Lafourche Parish School Bd.*, 04-1136 (La. App. 1 Cir. 2005), 909 So.2d 627 (chemical sensitivity); *Dunn v. Riverview Medical Center*, 01-1521 (La. App. 1 Cir. 6/21/02), 822 So.2d 736 (lymphedema of the upper arm); *Carmean v. Enterprise Products Partners, L.L.P.*, 00-1919 (La. App. 1 Cir. 11/9/01), 804 So.2d 95 (plantar fasciitis); and *LaCour v. Hilti Corp.*, 98-2691 (La. 5/18/99), 733 So.2d 1193 (elbow degeneration).

Finally, although the legislature has not included gradual hearing loss as an enumerated occupational disease, as the plaintiffs point out, it has also not been listed with the enumerated degenerative conditions specifically excluded under La. Rev. Stat. 23:1031.1(B), namely, degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular diseases.

Accordingly, we find no error in the court of appeal's determination that plaintiffs' gradual noise-induced hearing loss was a compensable occupational disease within the meaning of the LWCA, such that the defendants were entitled to immunity from suits in tort.

**CONCLUSION**

Because the plaintiffs' NIHL claims fall within the parameters of the LWCA, whether the pre-1990 definition of "accident" or the post-1975 definition of an "occupational disease," we conclude the defendants were entitled to immunity from suit in tort under the LWCA. Accordingly, the court of appeal properly reversed the judgment of the district court and dismissed the plaintiffs' claims. The judgment of the court of appeal dismissing the plaintiffs' tort claims with prejudice is affirmed.

SUPREME COURT OF LOUISIANA

NO. 2013-C-2878
CONSOLIDATED WITH
NO. 2013-C-2981

JAMES CLIFFORD ARRANT, ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

MARVIN JACK BARNETT, JR., ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

KENNETH NOEL BAIN, SR., ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

GEORGE EMORY BUTLER, ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

W. H. AUTTONBERRY, ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

JIMMIE DEWAYNE BAUGH, ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

CONSOLIDATED WITH

MELVIN ELLIS BORDELON, ET AL.
VERSUS
GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.

ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
SECOND CIRCUIT, PARISH OF OUACHITA

**JOHNSON**, Chief Justice, dissents for reasons assigned by Knoll, J.

**SUPREME COURT OF LOUISIANA**

**NO. 2013-C-2878**
**CONSOLIDATED WITH**
**NO. 2013-C-2981**

**JAMES CLIFFORD ARRANT, ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**MARVIN JACK BARNETT, JR., ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**KENNETH NOEL BAIN, SR., ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**GEORGE EMORY BUTLER, ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**W. H. AUTTONBERRY, ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**JIMMIE DEWAYNE BAUGH, ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**CONSOLIDATED WITH**

**MELVIN ELLIS BORDELON, ET AL.**
**VERSUS**
**GRAPHIC PACKAGING INTERNATIONAL, INC., ET AL.**

**KNOLL, JUSTICE, dissenting.**

Because I find NIHL is neither a covered occupational disease under any version of La. Rev. Stat. § 23:1031.1, nor a personal injury by accident under any applicable version of the LWCA, I respectfully dissent from the majority's affirmation of the judgment of the court of appeal and find plaintiffs' tort claims against their employers for NIHL are not barred by the exclusive remedy provision of the LWCA. Finding no manifest error, I would reinstate the judgment of the district court.

As well established, any interpretation of the provisions of the LWCA must take into account the basic history and policy of the compensation movement. *Stelly v. Overhead Door Company of Baton Rouge*, 94-0569 (La. 12/8/94), 646 So.2d 905; *Roberts v. Sewerage & Water Bd. of New Orleans*, 92-2048 (La. 3/21/94), 634 So.2d 341, 345. Likewise, as both *Stelly* and *Roberts* establish, although this Court liberally construes the coverage provisions of the LWCA, it narrowly construes the LWCA's immunity provisions. *Stelly*, 646 So.2d at 910; *Roberts*, 634 So.2d at 346. Given the decades of alleged exposure—from 1956 to the time of trial—the cumulative nature of the hearing loss, and the various amendments to LWCA over this substantial period of time, my examination of each version of the applicable LWCA provisions will proceed in a linear fashion.

### History of the LWCA

The history of workers' compensation began when the state of New York passed the first workers' compensation statute in the United States in 1910. Four years later, following the submission of a lengthy report and recommendation by a Commission tasked by Governor L.E. Hall to study and draft laws providing for compensation to injured employees, our Legislature enacted one of the first workers' compensation statutes in the South. In its report to the Legislature, the

2

Commission detailed there was "conservatism required" in enacting such a system of laws, because of the diverging approaches by the differing states. Furthermore, it was noted the concept of workers' compensation in Louisiana was "all in the experimental state." La. Sen. Journal Reg. Sess. 1914, p. 33. The Commission thus found conservatism was required because "no matter how moderate the act may be in its provisions, it is a radical departure, being suddenly adopted through the United States, from the line of thought which prevailed up to 1910." *Id.* Against that backdrop, La. Rev. Stat. § 23:1031 (1914) originally provided an employee who "receives personal injury by accident arising out of and in the course of [his] employment" is to receive compensation.[1]

### *Occupational Disease*

However, it was not until 1952 that the Legislature established express statutory authority for the coverage of occupational diseases under the LWCA. 1952 La. Acts No. 532. As then enacted, La. Rev. Stat. § 23:1031.1 provided, in pertinent part:

> Every employee who is disabled because of the contraction of an occupational disease as herein defined ... shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
> (A) An occupational disease shall include only those diseases hereinafter listed when contracted by an employee in the course of his employment as a result of the nature of the work performed....
> > 1. Poisoning by or other disease resulting from contact with
> > (a) the halogens, halogen compounds, and halogenated hydrocarbons
> > (b) alkaline materials
> > (c) arsenic, phosphorus, silenium, sulfur, tellurium, and their compounds
> > (d) oxygen, nitrogen, carbon, and their compounds
> > (e) cyanides and cyanogen compounds
> > (f) lead and lead compounds

---

[1] Similarly, La. Rev. Stat. § 23:1031 presently provides, in pertinent part: "If an employee … receives personal injury by accident arising out of and in the course of his employment, his employer shall pay compensation…."

(g) metals other than lead and their compounds
(h) aliphatic hydrocarbons and their nitro, diaso and amino compounds
(i) aromatic and cyclic hydrocarbons and their nitro, amino and other compounds
(j) alcohols
(k) organic and inorganic acids and their derivates and compounds
(l) esters of aliphatic, aromatic and inorganic acids
(m) aldehydes
(n) ketones
(o) ethers, glycols, glycol ethers, and their compounds
(p) phenol and phenolic compounds
2. Diseased condition caused by exposure to X-rays or radio-active substances.
3. Asbestosis.
4. Silicosis.
5. Dermatosis.
6. Pneumoconiosis.

La. Rev. Stat. § 23:1031.1 (1953).

While other states enacted compensation statutes providing blanket coverage for all occupational diseases, our Legislature chose a schedule approach, providing compensation for "contraction of an occupational disease," as defined, to be the exclusive remedy of the employee or his dependent. The statute explicitly provided coverage for two categories of "occupational disease." One category included specifically listed diseases, namely diseased conditions caused by exposure to X rays or radioactive substances, asbestosis, silicosis, dermatosis, and pneumoconiosis. The other category identified diseases by enumerated causative agents. No one disputes NIHL was not a specifically enumerated occupational disease, nor was excessive noise a listed hazardous or toxic substance. Therefore, NIHL was not a compensable occupational disease under the 1952 version of the LWCA. *See, e.g.*, *Rando v. ANCO Insulations, Inc.*, 08-1163 (La. 5/22/09), 16 So.3d 1065 (finding no foundation for expansive reading of statute considering limiting words of statute and adoption of scheduled approach).

4

Although almost every Louisiana legislative session until 1975 amended the LWCA one way or another (mostly to change the amount of compensation or the various listed disabilities, including the addition of tuberculosis in 1958 or to make minor adjustments dictated by experience in the work place), the amendments did not alter the conservative nature of the LWCA until the major amendments of 1975. By that point it had become apparent numerous employment-related diseases did not fit into the categories of occupational diseases enumerated in the 1952 version of the LWCA, and so the Legislature abandoned the schedule approach in favor of comprehensive coverage and revised La. Rev. Stat. § 23:1031.1 to amend the definition of occupational disease by removing the list of specific diseases and substituting the following:

> A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.
> B. An occupational disease shall mean only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease.

1975 La. Acts No. 583; *see also* La. Rev. Stat. § 23:1031.1 (1976).

Unquestionably, the 1975 Act's treatment of the definition of occupational disease encompassed far more diseases than the scheduled categories enumerated in the 1952 version; however, the question for this Court is whether the revised definition encompasses NIHL. After careful study and contemplation, I find it does not.

As stated above, an interpretation begins with the language of the statute, giving the words their "generally prevailing" and "technical" meanings. La. Civ. Code art. 11. And in a technical sense, gradual hearing loss is not a "disease" or

"illness" anymore than a sunburn is a disease or illness. E. Berton Spence and Carey W. Spencer, Accrual of Hearing Loss Actions Under the FELA: The Objective Standard Pre-Vails, 24 *Cumb. L. Rev.* 113 (1993). As the expert evidence shows, NIHL is hearing loss resulting from exposure to sound of sufficient duration and intensity to produce a decrease in auditory function. Such exposure produces instantaneous hearing impairment, and in this regard, it is a traumatic injury. Yet unless the noise is remarkably intense, the damage occurs in small increments, a bit more each day the worker is exposed, rendering this loss a cumulative traumatic injury. Thus, the worker does not lose enough hearing to fall below the "normal" threshold until several years have passed. A disease, by contrast, is usually thought of as something one is exposed to (a bacteria or virus) that then progresses on its own to a logical conclusion. NIHL does not, however, progress after exposure ceases, any more than does a sunburn after one comes in from outside.

Interestingly, *Merriam-Webster Dictionary* defines "disease" as "an illness that affects a person, animal or plant; a condition that prevents the body or mind from working normally." *Merriam-Webster.com*, "Disease" (9/10/14). *Oxford Dictionary* defines it as "a disorder of structure or function in a human, … especially one that produces specific signs or symptoms or that affects a specific location and is not simply the result of physical injury." *Oxforddictionaries.com*, "Disease" (9/10/14); *see also*, *Black's Law Dictionary*, "Disease" (6th ed. 1990)("Deviation from the healthy or normal condition of any of the functions or tissues of the body."). Defendants cite to both resources for the proposition that "[c]learly Plaintiffs' hearing loss meets these definitions of disease." Yet we note, NIHL is not an illness; rather, it is an injury resulting from physical trauma to the nerve follicles in the ear caused by excessive noise exposure over a duration of

time. Moreover, the spacious definition of "a condition that prevents the body from working normally" is applicable to almost any traumatic injury—a broken limb, a punctured lung, crushed trachea, severed artery—all of which would not under the common and general understanding of the term be considered diseases any more than hearing loss would.

Meanwhile, the medical definition provided by *Merriam-Webster* defines disease as "an impairment of the normal state of the living animal or plant body or one of its parts that interrupts or modifies the performance of the vital functions, is typically manifested by distinguishing signs and symptoms, and is a response to environmental factors (as malnutrition, industrial hazards, or climate), to specific infective agents (as worms, bacteria, or viruses), to inherent defects of the organism (as genetic anomalies), or to combinations of these factors." *Merriam-webster.com*, *supra*. *See also Black's Law Dictionary*, *supra* ("An alteration in the state of the body or of some of its organs, interrupting or disturbing the performance of the vital functions, and causing or threatening pain and weakness."). While admittedly hearing loss has been categorized as an impairment, *see, e.g.*, La. Rev. Stat. § 23:1221(4)(p) and Malone & Johnson, 13 *La. Civ. Law Treatise: Workers' Compensation Law and Practice* § 286 (5th ed. 2010), hearing itself is not a vital function. Note, we are not in any way attempting to define the term "disease" herein—that is the prerogative of the Legislature. Rather, we merely find, under its generally prevailing meaning, hearing loss is not a disease.

Moreover, the Legislature has amended the current definition of occupational disease since 1975 to exclude some diseases, such as degenerative disc disease, spinal stenosis, arthritis, heart-related or perivascular disease, and mental illness, *see* 1989 La. Acts 454 § 2, and to include carpal tunnel syndrome.

7

*See* 1990 La. Acts 943. Interestingly, the Legislature has never added gradual hearing loss. Its incorporation of carpal tunnel syndrome with a similar degenerative effect is indicative of the fact the post-1975 definition of occupational disease did not sufficiently cover same, thus necessitating its subsequent explicit incorporation.[2]

Significantly, I note, if gradual hearing loss was an occupational disease, the Legislature would not have had to enact a statute specifically providing coverage for firefighters' development of occupational gradual hearing loss. 2006 La. Acts 649; La. Rev. Stat. § 33:2581.1.[3] Moreover, the firefighters' statute itself explicitly provides the gradual hearing loss compensated therein "shall, for purposes of this Section *only*, be classified as a disease or infirmity connected with employment." La. Rev. Stat. § 33:2581.1(A)(emphasis added).[4]

Simply stated, although the LWCA is broadly interpreted to include coverage, this Court is still bound by the language of the statute, and given this

---

[2] La. Rev. Stat. § 23:1031.1 currently provides, in pertinent part:

> A. Every employee who is disabled because of the contraction of an occupational disease as herein defined, or the dependent of an employee whose death is caused by an occupational disease, as herein defined, shall be entitled to the compensation provided in this Chapter the same as if said employee received personal injury by accident arising out of and in the course of his employment.

> B. An occupational disease means only that disease or illness which is due to causes and conditions characteristic of and peculiar to the particular trade, occupation, process, or employment in which the employee is exposed to such disease. Occupational disease shall include injuries due to work-related carpal tunnel syndrome. Degenerative disc disease, spinal stenosis, arthritis of any type, mental illness, and heart-related or perivascular disease are specifically excluded from the classification of an occupational disease for the purpose of this Section.

[3] La. Rev. Stat. § 33:2581.1(A) provides, in relevant part: "Any loss of hearing which is ten percent greater than that of the affected employee's comparable age group in the general population and which develops during employment in the classified fire service in the state of Louisiana shall, for purposes of this Section only, be classified as a disease or infirmity connected with employment…."

[4] Significantly, as plaintiffs note, during the discussion of Senate Bill 204 (later enacted as Act 649) in the House Municipal Committee Meeting held on June 1, 2006, Representative Katz noted gradual hearing loss was not otherwise compensable as an occupational disease. *See* http://house.louisiana.gov/H_Video/2006/Jun 2006.htm.

8

restriction, this Court must leave it to the Legislature to expressly provide for coverage herein, as it did with carpal tunnel syndrome and in the firefighters' provision.

### *Personal Injury by Accident*

Moreover, I agree with the lower courts gradual hearing loss does not meet the definition of a personal injury by "accident" under any version of La. Rev. Stat. 23:1021(1). As discussed above although our LWCA has always from its very inception provided compensation to an employee who "receives personal injury by accident arising out of and in the course of [his] employment," La. Rev. Stat. § 23:1031 (1914-2014), the Legislature, in 1918, amended the LWCA to explicitly define the terms accident and personal injury:

> (1) "Accident" means an unexpected or unforeseen event happening suddenly or violently, with or without human fault and producing at the time objective symptoms of an injury.
>
> ….
>
> (7) "Injury" and "Personal Injuries" includes only injuries by violence to the physical structure of the body and such disease or infections as naturally result therefrom. These terms shall in no case be construed to include any other form of disease or derangement, however caused or contracted.

La. Rev. Stat. § 23:1021 (1918).

As an initial matter, the expert evidence at trial establishes gradual hearing loss by its very nature does not happen either "suddenly or violently," nor does it produce "at the time objective symptoms of an injury." Rather, like water wearing on stone, the damage is incrementally minute, sustained gradually over time, and only apparent after years of constant exposure to pressure. Thus, NIHL would not constitute a personal injury by accident under the explicit wording of this provision. But though the purpose of the 1914 statute may have initially been to cover only work-related "accidents," with the advancement of the industrial

revolution and the growing number and types of diseases arising from work-related activities, a liberal interpretation was given to the statute, which "effectuated its beneficent purpose of relieving workmen of the economic burden of work-connected injuries by diffusing the costs in channels of commerce." *Rando*, 08-1163 at p. 11, 16 So.3d at 1077 (quoting *Parks v. Insurance Co. of North America*, 340 So.2d 276, 281 (La.1976)). Consequently, judicial interpretation of the statute often resulted in occupational illnesses and diseases being classified as "accidents" under the LWCA:

> Louisiana is among the many jurisdictions that look to the employee to determine whether there was an unexpected and catastrophic effect upon him in deciding that an injury is accidental. *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La. 1972). We have held that extraordinary physical stress and strain is not essential to the definition of disabling accident: when the performance of the usual and customary duties of a workman cause or contribute to a physical breakdown, the statutory requirements for an accidental injury are present. *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La.1972); *Bertrand v. Coal Operators Casualty Co.*, 253 La. 1115, 221 So.2d 816 (1968). More particularly, we have recognized that the fact that a condition may commonly be referred to as an illness or disease does not thereby preclude its classification as an accident. *Jennings v. Louisiana Southern Life Insurance Co.*, 290 So.2d 811 (La.1974). In *Jennings*, we noted that among other conditions frequently termed as diseases, heart disease, stroke, heat stroke, herpes zoster (shingles), cancer and 'bends' have all been treated as compensable accidents within the contemplation of the Workmen's Compensation Act.

*Parks*, 340 So.2d at 281.

Two lines of interpretation thus developed. One line of cases made it clear where an injury, such as a heart attack or stroke, occurs and the manifestation of that injury is sudden or violent, then that sudden manifestation—even if it was the culmination of a slowly developing malady—would be an "accident" under the LWCA. This Court's decision in *Ferguson v. HDE, Inc.*, 270 So.2d 867 (La.1972) is an example of this interpretation. In *Ferguson*, an employee received a

10

paycheck that was lower than he expected, after which he became angry and went to argue about the amount with his employer. During the argument, the employee felt a flash of pain followed by paralysis. Although an argument with his employer was not in and of itself "a violent or sudden event," the *Ferguson* court found the employee had suffered an injury from an accident, stating: "Although he received no blow or trauma .... the injury was accidental because it was unexpected and unforeseen. It happened suddenly and violently. It produced at the time objective symptoms of an injury." *Id.* at 869.[5]

A second line of cases suggested when an employee is exposed to work conditions, which either aggravate a pre-existing condition or cause a symptomatic degeneration in the employee's health, and a distinct event occurs where the symptoms become disabling, then this may also be characterized as an "accident." In *Parks*, the employee was a seamstress who was bothered by conditions of the factory where she worked. After working for four months, plaintiff started to experience a sore throat, running nose, and nagging cough. Shortly after these symptoms presented, plaintiff lost weight and contracted a fever. Days later, she was hospitalized with chronic bronchitis and sought workers' compensation benefits from her employer. The court found, although the seamstress could not point to one event which had precipitated those acute symptoms requiring hospitalization, she had in fact suffered an "accident." Relying on *Ferguson*, the Court stated:

> We are satisfied, therefore, that the acute illness suffered by
> plaintiff in the instant case constitutes an 'accident' as that term is

---

[5] The required "injury by accident" has thus been found to have occurred in instances of heart attack, *see*, *e.g.*, *Guidry v. Sline Indus. Painters, Inc.*, 418 So.2d 626 (La. 1982); cerebral hemorrhage, *see*, *e.g.*, *Griffin v. Employers' Liability Ins. Co.*, 186 So.2d 349 (La. App. 4th Cir. 1966); hernia, *see*, *e.g.*, *Hill v. J.B. Beaird Corp.*, 19 So.2d 295 (La. App. 2d Cir. 1944); abscessed lung, *see*, *e.g.*, *Stiles v. International Paper Co.*, 39 So.2d 635 (La. App. 2d Cir. 1949); spontaneous pneumothorax, *see*, *e.g.*, *Dortch v. Louisiana Central Lumber Co.*, 30 So.2d 792 (La. App. 2d Cir. 1947).

defined in the compensation act and interpreted in our jurisprudence. The medical testimony is clear that during her episode of acute bronchitis plaintiff suffered an injury, i.e., "violence to the physical structure of her body." The injury was accidental because it was unexpected and unforeseen and occurred suddenly producing at the time objective symptoms. We are confirmed in our conclusions by the well-reasoned opinions in *Geist v. Martin Decker Corp.*, 313 So.2d 1 (La.App. 1st Cir.1975) and *Gotte v. Cities Service Oil Co.*, 298 So.2d 920 (La.App. 3d Cir.1974) wherein hepatitis and pneumonia were both held to be within the statutory definition of accident when the contraction of these conditions was causally related to plaintiffs' employment.

*Parks*, 340 So.2d at 281. Still, to find an accident under these terms, our courts required at least some identifiable event or incident during employment where the employee could demonstrate a palpable injury.[6]

My research shows gradual hearing loss has never been classified as an accidental injury under the statute although two cases have been often cited for that proposition. While these cases, *Chatelain v. American Can Co.*, 344 So.2d 1180

---

[6] *See also Melder v. Century Telephone Enterprises, Inc.*, 413 So.2d 1325, 1328 (La. App. 3d Cir. 1982)(worker with pre-existing back condition was aggravated by the demands of the job such that worker's ultimate injury—a herniated disc—was deemed an "accident"); *Harper v. Kast Metals Corp.*, 397 So.2d 529 (La. App. 2d Cir. 1981)(plaintiff with pre-existing arthritis whose employment left him with sore wrists testified that on a specific date, he twisted one of his wrists; found to be an "accident"); *Hall v. Georgia-Pacific Corp.*, 390 So.2d 948, 949 (La. App. 2d Cir. 1980)("accident" when plaintiff with pre-existing automobile injury worked in lumber mill and experienced a "sudden popping" in his shoulder in the course of working with the plywood); *Romero v. Otis Intern.*, 343 So.2d 405, 409-10 (La. App. 3d Cir. 1977)(hearing loss when working with air hammer was an "accident" because "a part of [plaintiff's] body, his inner ear, suddenly gave way while he was discharging his usual and customary duties"); *Chism v. Kaiser Aluminum & Chemical Corp.*, 332 So.2d 784 (La. 1976)(plaintiff received a series of occupational injuries for which he sought medical care; after returning to work and performing the same strenuous duties, the pain became so severe he was hospitalized with a herniated disc; characterized as "accident"); *Lum v. Employers Mut. Liability Ins. Co. of Wis.*, 216 So.2d 889 (La. App. 2d Cir. 1968)(plaintiff's job required him to stuff giblets into frozen chickens; plaintiff suffered from pre-existing arthritis; court found he suffered "accident" because on one occasion while stuffing chicken plaintiff felt a sudden 'popping' of wrist); *Comoletti v. Ideal Cement Co*, 147 So.2d 711, 719 (La. App. 1st Cir. 1962)(hearing loss while "shooting kilns" accident occurring "suddenly and unexpectedly as a result of [plaintiff's] exposure to noise of excessive and unusual intensity on a specific date, namely, July 28, 1960."). In one instance, a court suggested the definition of "accident" did not require a final conclusory event; however, this interpretation was dependent on a work injury caused by the aggravation of a pre-existing condition. *McCoy v. Kroger Co.*, 431 So.2d 824, 829 (La. App. 2d Cir. 1983)("In our view the current jurisprudential definition is such that an 'accident' has occurred within the meaning of the compensation act where the conditions of employment provide continual strain or trauma as here, or exposure, as in *Parks*, … and these events cumulatively combine to aggravate a pre-existing condition so as to disable the employee even though each individual event in itself is very minor in character.").

(La. App. 4th Cir. 1977), and *Quine v. Ideal Cement Co.*, 351 So.2d 1303 (La. App. 1st Cir. 1977), *writ denied*, 353 So.2d 1035 (La. 1978), explain physical strain is not needed for an injury to be considered an "accident" under the LWCA and regular workplace conditions can cause or contribute to an "accident," in each case the plaintiff complained of hearing loss during the period of employment— that is, there was an acute, identifiable occurrence of injury—and both concerned a hearing loss injury that created a conclusive and final event: the inability of the worker to perform his duties. *See Quine*, 351 So.2d at 1304 ("On May 22, 1974, plaintiff was unable to continue his work");[7] *Chatelain*, 344 So.2d at 1181 ("requested a change of positions … because of hearing problems May 5, 1975").[8] Moreover, both employees' claims were ultimately dismissed for a failure to prove causation, not on the issue of coverage under the LWCA as an accidental injury.

In this case, however, the plaintiffs' hearing loss did not lead to a sudden breakdown or force the employees to cease working; instead, the loss was not discovered for decades. Moreover, given its gradual and insidious nature, gradual hearing loss is neither palpable nor "sudden," "acute," or "identifiable." As the experts opined herein, it is a cumulative permanent loss of hearing that develops

---

[7] The employee in *Quine* had complained of hearing loss for four years and sought medical treatment before his hearing loss prevented him from performing his duties. Although the court set forth the analysis related to the definition of "accident" under the LWCA, its focus centered on the plaintiff's failure to show his hearing loss was caused by the conditions of his employment and not caused by Meniere's disease.

[8] In *Chatelain*, plaintiff alleged the loud noises associated with his employment forced him to request a change in position with his employer, after which he sought permanent disability. The district court found the plaintiff did not prove an accident. The court of appeal, however, agreed "with appellant that extraordinary physical stress and strain is not essential to the definition of disabling accident .... [though] the real issue before us is whether the plaintiff sustained his burden of proof of causation of the hearing loss." *Chatelain*, 344 So.2d at 1181-82. Finding plaintiff failed to prove causation, the appellate court affirmed the district court's dismissal of plaintiff's claim.

13

gradually over many years of exposure to hazardous noise.[9]  Accordingly, we find the gradual hearing loss at issue would not fall within the expansive jurisprudential interpretation of "accident" as defined by the 1918 version of the LWCA.

Against this background of a very broad judicial reading of the term, the Legislature, in 1989, amended the definition of "accident."  *See* 1989 La. Acts 454. La. Rev. Stat. § 23:1021(1) now provides:

> "Accident" means an unexpected or unforeseen actual, identifiable, precipitous event happening suddenly or violently, with or without human fault, and directly producing at the time objective findings of an injury which is more than simply a gradual deterioration or progressive degeneration.

La. Rev. Stat. § 23:1021(1)(2014).

Of particular relevance here is the addition of the requirement that an accident must be an "actual, identifiable, precipitous" event "directly" producing objective findings of an injury that is "more than simply a gradual deterioration or progressive degeneration."  "This additional language was clearly intended to reverse the established trend in the jurisprudence to permit coverage for disability which appears to be clearly work-related but does not fit the statutory definition of accident."  Malone and Johnson, *supra* § 216.  As gradual hearing loss would not

---

[9] Notably, in *Chatelain v. Am. Can Co.*, 387 So.2d 670, 671 (La. App. 4th Cir.)(*Chatelain* II), *writ refused*, 394 So.2d 275 (La. 1980), the court held:

> Accepting plaintiff's petition's allegations as true, his petition would state a cause of action for workers' compensation and it might therefore be argued that the judgment appealed from is not wholly correct. However, the context is that plaintiff has already tried and lost a suit for workers' compensation, 344 So.2d 1180, this court finding that he did not prove his hearing problems were caused by his work environment. Thus, insofar as the petition is viewed as stating a cause of action for workers' compensation, defendant's exception of res judicata would require its dismissal. And, to the extent that plaintiff seeks any recovery other than workers' compensation, he does not state a cause of action because of the exclusivity of workers' compensation, R.S. 23:1032.

Any reliance on this case for the proposition a claim for gradual occupational hearing loss sounds in workers' compensation as an accidental injury, however, would be misplaced as the preceding decision did not dispose of the issue of coverage under the LWCA or decide whether the injury would fall under accident or occupational disease, and its holding was specific to the petition therein.

fall within the expansive purview of the jurisprudential interpretation of the preceding definition, it most assuredly will not fall within the current definition. Therefore, I find, although the injury in question does arise out of and in the course of employment, neither its cause nor its onset is sudden or violent, and therefore, NIHL is not a personal injury by accident under any version of La. Rev. Stat. §§ 23:1021 or 23:1031.

Because the injury at issue here is neither a personal injury by accident nor an occupational disease, it is not covered by the LWCA and, thus, not compensable therein. Moreover, we note with significance no Louisiana court has ever awarded compensation for gradual hearing loss under the LWCA. As our jurisprudence has long held, if a certain type of injury is not compensable under the LWCA, even though clearly work-related, then it is not subject to the exclusivity provision, and there is no tort immunity. *Boyer v. Crescent Paper Box Factory*, 143 La. 368, 380, 78 So. 596, 600 (1917). Therefore, I find the district court did not legally err in allowing this matter to proceed in tort, and I would reverse the judgment of the court of appeal which as this opinion has clearly shown constituted a drastic departure from our jurisprudence and interpretation of the LWCA since its very inception.